### WOLFE et al. v. UNITED STATES HOUSING AUTHORITY et al.

No. 564.

District Court, W. D. New York.

Dec. 26, 1940.

Buecking & Sengbusch, of Buffalo, N. Y., for plaintiffs.

George L. Grobe, U. S. Atty., and Robert M. Hitchcock, Asst. U. S. Atty., both of Buffalo, N. Y., for United States Housing Authority.

David Diamond, Corp. Counsel, and Fred C. Maloney, Asst. Corp. Counsel, both of Buffalo, N. Y., for Buffalo Municipal Housing Authority.

· KNIGHT, District Judge.

A motion is made by the plaintiffs herein for an injunction pendente lite to restrain the defendants from taking proceedings to dispossess certain lessees in "Kenfield," a public housing project, in the City of Buffalo, New York, erected and administered pursuant to the United States Housing Act of 1937, Chap. 896, 50 Stat. 888, U.S.C.A. Title 42, Sections 1401 et seq., and the Public Housing Law of the State of New York, Chap. 823 of the Laws of 1926, as amended, Unconsol.Laws, § 2251 et seq., and now included as Chapter 44-A of the Consol.Laws. The motion is supported by verified complaint and affidavits.

Concurrent with the aforesaid motion, the defendants, United States Housing Authority and the Buffalo Municipal Housing Authority, appearing specially and separately, move to dismiss the complaint on the grounds that the court has no jurisdiction and that the complaint fails to state a cause of action.

There is no substantial dispute about the facts. By the Act of 1937 the United States Housing Authority was created as "an agency and instrumentality of the United States" for the purpose of carrying out the provisions of the aforesaid Housing Act. "Kenfield" was built by the United States government under the Works Project Administration, and it was transferred by the government to the United States Housing Authority in November, 1937. The defendant, Buffalo Municipal Housing Authority, was organized pursuant to the aforesaid statutes of the State of New York and is a public authority and a governmental agency. The Federal Act, among other things, provided that the United States Housing Authority should, as soon as practical, divest itself of the management of public building projects, such as "Kenfield", and on October 1, 1938, "Kenfield" was leased by the United States Housing Authority to the Buffalo Municipal Housing Authority. By the terms of the statutes of New York, the agencies therein authorized to be created were given the power, among

other things, specifically to "lease, manage, operate or acquire any projects undertaken or completed by any government." Since the lease aforesaid to the Buffalo Municipal Housing Authority, that Authority through its board of directors has held "Kenfield" under lease from the United States Housing Authority and has managed and operated it.

The Federal Act of 1937 declares it: "to be the policy of the United States to promote the general welfare of the Nation by employing its funds * * * to assist the several States * * * to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, * * * that are injurious to the health, safety, and morals of the citizens of the Nation." 42 U.S.C.A. § 1401.

It defines dwellings in low rent housing: "The dwellings in low-rent housing * * * shall be available solely for families whose net income at the time of admission does not exceed five times the rental * * * of the dwellings to be furnished such families, except that in the case of families with three or more minor dependents, such ratio shall not exceed six to one." 42 U.S.C.A. § 1402.

It defines families of low income as those "who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or metropolitan area to build an adequate supply of decent, safe, and sanitary dwellings for their use." 42 U.S.C.A. § 1402.

The lease executed between the United States Housing Authority and the Buffalo Municipal Housing Authority on October 1, 1938, among other things, provided that "The Lessee shall make the dwellings in the Project available only to 'families of low income', which for the purpose of this lease means families who are in the lowest-income group and who cannot afford to pay enough to cause private enterprise in the metropolitan area of the City of Buffalo to build an adequate supply of decent, safe and sanitary dwellings for their use, provided, that the dwelling accommodations shall be available solely to families whose net income at the time of admission does not exceed five times the rental * * * except that in the case of families with three or more minor dependents such ratio shall not exceed six to one." Incorporated

in such lease there were provisions defining the eligibility of families for occupancy and also fixing a scale of rentals for such dwellings as follows:

### Monthly Dwelling Rents

| Type of Unit | Minimum Rent | Maximum Rent | Approximate Average Rent |
|---|---|---|---|
| 1 Bed Room | $24.00 | $25.50 | $24.67 |
| 2 Bed Rooms | 28.00 | 31.00 | 29.00 |
| 3 Bed Rooms | 31.00 | 33.75 | 32.07 |

It does not appear when the tenancy of the plaintiffs began. Some leases in "Kenfield" were executed to individual tenants by the United States Housing Authority. These leases were taken over by the Buffalo Municipal Housing Authority. All leases executed to individuals prior to October 1, 1940, appear to have been executed upon the basis set forth in the lease to the Buffalo Municipal Housing Authority.

In the year 1939 a real property survey of the city of Buffalo was made by the Works Project Administration. This included a sub-standard housing study. Such study and survey disclosed that approximately 30,469 families with incomes less than $2,000 per year were living in substandard housing; that 26,373 had annual incomes of less than $1,800; 24,852 had annual incomes of less than $1,600; 10,523 between $1,000 and $1,600; 12,044 between $1,000 and $1,800. On September 13, 1940, the Buffalo Municipal Housing Authority had pending with it applications of 5,261 persons for admission to "Kenfield." These applicants showed incomes between $1,000 and $2,000 and of that number 3,734 had incomes between $1,000 and $1,750 and 3,108 between $1,200 and $1,750.

In the "Kenfield" project there are 658 unit dwellings; 536 being row of houses, two stories in height, and 120 apartments housed in 16 different buildings; 520 tenants have incomes of $1,745, or less, and of these 79 percent have incomes under $1,599, 63 percent have incomes under $1,499, 47 percent have incomes under $1,300, and 10 percent have incomes under $1,000.

The board of directors of the Buffalo Municipal Housing Authority on September 13, 1940, having before it the study and survey and the record of occupancy of "Kenfield", adopted the following resolution: "Be it resolved that the income limit for continued occupancy of the residents of

Kenfield Project be established at the statutory limit for the apartment occupied by each resident, or the sum of $1750.00 per annum, whichever shall be lower."

The Board also adopted a rental schedule slightly changing that theretofore existing. The schedule of rents fixed by the Board follows:

The provision with reference to the termination of the tenancy refers to the renewal period and that alone.

Following the execution of the lease of 1940, the tenants of "Kenfield" were given an opportunity for a hearing before the Board of the Buffalo Municipal Housing Authority touching their qualifications as

| Average Rentals | Room Per Month | Dwelling Per Month |
| --- | --- | --- |
| Shelter Rent | | |
| Utility Charge | $4.72 | $21.70 |
| Shelter Rent plus utilities | 1.66 | 7.65 |
| | $6.38 | $29.35 |

| No. | Type of Dwelling | | | | Rooms | Shelter Rent Plus Utilities | Statutory Rental Value |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 122 | 1BR, | LR, | K, | | 3 | $24.68 | $24.38 |
| 290 | 3BR, | LR, | K, | DS | 4½ | 29.00 | 28.65 |
| 246 | 3BR, | LR, | K, | DS | 5½ | 32.07 | 31.72 |
| 658 | Average 4.6 Rms/Dwell | | | | | $29.35 | $29.00 |

On October 1, 1940, at the expiration of the lease of 1938, the United States Housing Authority again leased "Kenfield" to the Buffalo Municipal Housing Authority for a period of two years, commencing with that date. This lease contains this specific provision: "The Lessee covenants and agrees to administer the Project in accordance with the provisions of its Resolution No. — (herein called the Management Resolution) adopted by the Lessee on the — day of ———, 19—, and hereby approved by the Lessor, which sets forth, for the initial term of this lease, major policies for the selection of tenants and for the management, * * * of the Project * * *. The Management Resolution is by reference made a part of this lease, * * *."

The individual leases to the tenants of "Kenfield" recite the eligibility of the lessee, including the amount of his annual aggregate income stated to be five or six times (as the case may be) the annual rental of the premises. The lease further provides the duration of the lease and that "This lease shall be automatically renewed for successive terms of one month each at the rental hereinafter specified. Either the Landlord or Tenant may terminate the tenancy on any day during the month provided the party terminating the tenancy gives the other party hereto 15 days' prior notice in writing."

coming within the low-income groups, as fixed by the resolution of September 13, 1940, and the lease subsequently made between the United States Housing Authority and the Buffalo Municipal Housing Authority. It is not claimed that any of these plaintiffs, or those in whose behalf they sue, have annual incomes lower than $1,750. The individual lessees who had annual incomes in excess of $1,750 were given notice to vacate. Of the 100 or more tenants so notified to vacate between 25 and 30 have already removed.

The plaintiffs misconstrue the 15-day notice provision. The lease is executed for a definite period of a year. The 15-day provision has no application to the definite annual term. It is claimed that the 15-day clause in the lease was inserted because of other conditions in the covenant such as the proper care of buildings and equipment. No merit appears in this. It is the claim that the defendants' proposed act would give "arbitrary hire and fire blanket authority concomitant with private ownership." If they have such authority, it is not attempted to be exercised here. Section 156, subdiv. 3 of the New York Housing Law, provides that in the event that the income is increased to the extent of not more than fifty percent over that at the time of admission and such increase continues for a period of three months or

584

more the authority may permit the tenant to occupy his dwelling provided the authority is convinced the tenant can not secure safe and sanitary dwelling from private enterprise. Subdivision 4 of that section also provides for renewal on three months' notice where the increase in income is fifty percent or upwards. It is asserted that these provisions would be wholly meaningless if defendants' contention is true. The foregoing provision in subdivision 3 is permissive, and as such it is consistent with the resolution adopted by the Board.

It is contended that these plaintiffs will suffer financial loss because they have disposed of certain household equipments replaced by the Housing Authority and that they will suffer inconvenience at this time if removed. In the first place, it appears that facilities were provided to store this equipment of the tenants. In the second place, they stand in no other situation than any other individuals with corresponding incomes. Obviously they may be inconvenienced and suffer financial loss through forced removal, yet this does not deny the right of the landlord to possession.

Equitable consideration makes little appeal here from any standpoint. It is a well known fact that the federal government generously in many communities has expended vast sums of money in the construction of housing projects. Definitely they were limited to the use of the low-income groups. That is the only constitutional basis for these expenditures. Clearly it must have been in mind that through economic changes the statute of a group would change. Clearly it was intended that groups with incomes sufficient to provide adequate dwellings for themselves should do so. This governmental construction can not be indefinitely extended. It must be, if plaintiffs' contention is true, and if we are also to meet the needs of these in still lower income groups. With due regard to its spirit and intent, upon no reasonable construction of this statute can it be held that these tenants are entitled to an indefinite tenure. At the expense of the taxpayers of the country the benefits of these dwellings equipped with modern furnishings have been provided these tenants. A sense of responsibility to share in this burden should actuate all who are or become able to bear a fair share in it.

The complaint states no cause of action.

For the reasons hereinbefore stated, the complaint must be dismissed.

Finding as above stated, it is unnecessary to pass on any other question raised.