Arthur Markewich, J.
Plaintiffs move for a temporary injunction. Defendant Corporation Counsel of the City of New York and his codefendant, the city itself, cross-move (No. 87, same calendar, consolidated herewith for disposition) for dismissal of the complaint of the original plaintiffs; the corporate codefendant, Big Six Towers, Inc., also cross-moves to dismiss.
Plaintiffs complain the projected condemnation of their property in the exercise of eminent domain to be an unconstitutional use of the Mitchell-Lama Law (Public Housing Law, art. 12, § 302). The claimed unconstitutional exercise stems principally from the contention that the property so to be taken will benefit a middle income group, whereas- the Constitution and statute authorize such action only for the benefit of low income groups.
Section 1 of article XVIII of the New York State Constitution reads : “ Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto.” It is to be noted that it is left to legislative action to define what is meant by “ persons of low income.” Section 2 of article XVin provides, subject to certain limitations, that the Legislature may authorize and provide for State and municipal loans in aid of corporations regulated by law as to rents, profits and dividends, grant or authorize partial or total tax exemption, and grant the power of eminent domain to any city, town or village and to any corporation regulated by law as to rents, profits and dividends, and engaging in public housing facilities. Section 10 of that article provides: “ The legislature is empowered to make all laws which it shall deem necessary and proper for carrying into execution the foregoing powers. This article shall be construed as extending powers which otherwise might be limited by other articles of this constitution and shall not be construed as imposing additional limitations ’ ’.
The proposed buildings are the project of the Typographical Union upon a co-operative basis. The co-operators will pay approximately $500 per room and a maintenance charge of approximately $21 per room in 697 units comprised of 2% to *820 6Y2 rooms. These units are to be available to persons of annual income of $7,000.
Does this permissible income range of the co-operators remove this project from the low income class, and, accordingly, render it impermissible under the Public Housing Law? Stated another way, has the legislative definition of 11 low income ’ ’ here examined gone beyond the power actually conferred? Subdivision 18 of section 3 of the Public Housing Law declares: ‘ ‘ The terms ‘ persons of low income ’ and ‘ families of low income ’ mean persons or families who are in the low income groups and who cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings ” and subdivision 23 of that section states: ‘ ‘ The term ‘ low rent housing ’ means dwellings within the financial reach of families of low income and embraces recreational and other facilities incidental and appurtenant thereto.”
In 1939, in legislating upon a similar subject, proposals were rejected that families and persons of low income are persons and families in the lowest income groups. The Public Housing (Mitchell-Lama) Law of 1955 (ch. 407) declares (§ 302) as to the policy and purposes of article XII: ‘‘ It is hereby declared that there exists in municipalities in this state a seriously inadequate supply of safe and sanitary dwelling accommodations for families and persons of low income * * * that such conditions constitute an emergency and a grave menace to the health, safety, morals, welfare and comfort of citizens of this state, necessitating speedy relief which cannot readily be provided by the ordinary unaided operation of private enterprise ”. And it is provided by subdivision 2 of section 318 (as amd. by L. 1956, ch. 877): “ The dwellings in a [limited-profit housing] company project shall be available for persons or families of low income whose probable aggregate annual income at the time of admission and during the period of occupancy does not exceed six times the rental, including the value or cost to them of heat, light, water and cooking fuel, of the dwellings that may be furnished to such persons or families, except that in the case of families with three or more dependents, such ratio shall not exceed seven to one. The ‘ probable aggregate annual income ’ means the annual income of the chief wage earner of the family, plus all other income of other adult members of the family, plus a proportion of income of gainfully employed minors, the proportion to be determined by the company as approved by the commissioner in the case of a state-aided project or the municipal comptroller, in the case of a municipallv-aided project.” Thus, *821 the Legislature adopted a broad but specific standard for the determination of the applicant’s income status in relation to his ability to obtain adequate housing and did so pursuant to the power conferred by article XVTII of the Constitution. Thus, too, the particular constitutional and statutory provisions were indeed intended to benefit low income groups but did so in respect to the ability of any portion of such low income groups financially “ to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings.” In this context the Legislature is not required to regard an applicant’s income status or a group’s income status as a statistic and in a vacuum. Statistics have real meaning only in relation to any specific investigation and its object to be achieved. In this sense, determination of the income status of an applicant requires more than the statement of a ceiling on income. The tests embodied in the statutes are calculated to breathe life into bare arithmetic by translating it into terms of people who, no matter what their income may seem to be in terms of dollars, experience only frustration when they attempt to purchase minimally decent housing with these dollars.
The statistical considerations entering in the income-rent relationship are thus within the constitutional command, and are reasonable and sensible. Is there a need, then, for public assistance of this character to place the earner in a housing accommodation within his range of economic capability to enjoy standard, safe housing! Does the emergency and shortage declared in the statute actually exist! The fact, if indeed it be fact, that new housing has exceeded the growth in the number of families is not necessarily controlling, A shortage does not come into being only because the number of families to be housed is more than the existing number of units. Other factors must be considered: families have grown larger, families have been forced to strain the walls by doubling up, outworn housing requiring major repair and Avhich should have been demolished is still in use for lack of better, housing without hot water or private toilet or bath facilities remains in use by people who have learned to regard these things as minimum requirements, ideas of sanitation have changed, ideas of the better life are in the minds of more people — all these and many other related factors combine to bring about a shortage of sufficient units in the rental market available to what plaintiffs here argue to be above a lower income group. Public assistance to alleviate such a shortage has proven wise and benefieient and to suggest that sufficient units for such a rental market have been produced or that the Public Housing Law and this project in particular do not meet *822 constitutional and statutory standards and requirements is to do violence to the facts.
It is true that the area sought here to be condemned has not been found to be a slum area, but it is not necessary to accomplish the purposes of the act by the physical removal of slum areas. To frustrate the beneficient purposes of public housing is to keep people in steadily deteriorating housing for want of better, and thereby to cause their present abodes to degenerate into slums. And this makes no difference whether the income of those sought to be aided is in the lowest income group or above that group, so long as the income is not sufficient to produce that rental which will attract private industry to build housing.
The constitutional provisions have been fairly implemented by the legislative standards. This has not been an excessive use of power. The definitions are capable of application to those who seek to become co-operators in this project. The need is a public need. The purpose is a public purpose and the projected use is for such purpose. All this being established, the court may not here inquire further behind the condemnation, for the validity of exercise of power is cognizable in a condemnation proceeding itself and it may be questioned therein.
No need has been demonstrated for injunctive relief inasmuch as there can be no irreparable harm to plaintiffs which cannot be prevented in the condemnation proceeding itself. Nor do the intervenors (Lucky Star Realty Corp. and Land Corporation of New York) stand on any firmer ground than do the original plaintiffs; they have elected not to make their own motion but to rely on the motion of the original plaintiffs and they are, therefore, no more entitled to injunctive relief than the original plaintiffs. The motion for injunction is denied.
The complaint does not state a cause of action. Its claims are, in brief, to the effect that exercise of the power of eminent domain would not be in aid of the constitutional purpose of section 1 of article XVIII and that condemnation proceedings would not serve a public purpose. Such conclusions are based on these allegations: that the area to be acquired is vacant land in a residential district not determined by the City Planning Commission to be substandard and insanitary; that, the housing being available to earners of approximately $7,000 a year, an allegedly middle income group which cannot afford conventional housing and is not eligible for subsidized housing is not such as is envisioned by the constitutional provision; that the Legislature intended, in fact, that the legislation was to benefit middle and not low income groups (citing documents of the Joint Legislative Committee on Housing and Multiple Dwellings), *823 and therefore did not carry out the constitutional purpose. The legislative documents, the statutes, and the constitutional provisions do not bear out plaintiffs’ contentions. It is clear, from a reading of the complaint in the light of the statutes, that the project here attacked is designed for those who have been found by the appropriate public agency to be persons falling within the legislative definition, for housing purposes as constitutionally provided, of persons of low income, from which would follow that no cause exists to grant the relief prayed for.
The cross motions of all defendants are granted. Settle order.