Michael Catalano, J.
Plaintiff moves, for “ an order * * * enjoining defendant and its employees and agents from the doing of any acts in furtherance of, or pursuant to a conversion plan proposed by it and approved by the State Housing Commissioner pending a final determination of the plaintiff’s action for a declaratory judgment.”
Defendant cross-moves “for an order denying the request for temporary injunction and for an order, pursuant to Buie 113 of the Rules of Civil Practice, dismissing the complaint.”
Plaintiff states that he is a tenant of the £ ‘ Dante Public Housing Project;” he questions the constitutionality of defendant’s proposal to convert a public housing project for persons of low income to a private co-operative apartment operation for persons of substantially higher incomes; that defendant is removing and relocating tenants from said project, remodel-ling and redecorating various apartments for tenants who meet requirements of a down payment and stipulated rentals, circulating a questionnaire to present tenants as to their preference to be located at some other housing project; that practically all tenants of 144 Dante Place have been moved out and others are moving rapidly; that plaintiff desires to preserve the status quo pending the final judgment in this action; that one tenant, his wife and five children have lived there at a monthly rental of $65 in a three-bedroom apartment, and a comparable apartment in the proposed Marine Drive co-operative project would require a down payment of $75 and $100 monthly rent; that this removal of tenants affects their grammar school children who will have to change schools and will injure their furniture.
The defendant’s papers show that plaintiff is a tenant of defendant at the Dante Place Housing Project on a month-to-month term, having no vested rights which are affected by the proposal to lease to a limited dividend housing company; that defendant will comply with preferences of tenants for relocation at other public housing projects and will pay the moving expenses; that defendant has entered into a firm contract for such moving at its expense; that the down payment will entitle *600 the new tenants to shares of stock in the limited dividend housing company; that 440 of the 616 units will require rents of less than $90 per month and permit occupancy only by tenants with income of less than $7,000 per year; that the average rental for all the units at the rates listed is $88 per month; that schedule of monthly dwelling unit rentals shows the lowest monthly rental of $67, down payment rate of $200, income limit of $5,328, also, graduated increases to the highest monthly rental of $116, down payment rate of $350, income limit of $10,500; that this proposed schedule sets forth incomes for families who cannot afford to pay enough to cause private enterprise in the City of Buffalo to build a sufficient supply of adequate, safe and sanitary dwellings.
That by order of this court granted September 21, 1960, the Attorney-General of the State of New York was permitted to appear in this action pursuant to section 15 of the Public Housing Law, and by oral stipulation by counsel of all the parties in open court, the State of New York was allowed to join as a party defendant in all papers presented herein by the defendant Buffalo Municipal Housing Authority.
The complaint alleges, in effect, that plaintiff is a tenant of Dante Project in Buffalo, New York, a State-aided public housing project, development number NYS-43A, with the approval of the New York State Commissioner of Housing since 1952; that under section 6 of article XVIII of the New York State Constitution, and section 17 of the Public Housing Law, occupancy of Dante Project is restricted to persons of low income; that in November, 1959 defendant, with said Commissioner’s approval, proposed to convert Dante Project, to occupancy by persons of ‘ ‘ substantially higher incomes; ’ ’ that the project would be leased to a limited dividend housing company as a co-operative which would ‘ ‘ sell ’ ’ a share of its lease to new tenants, ‘ ‘ as consideration for a down payment made by such tenants ’ ’ that said proposal contemplates occupancy of middle-income families, particularly retired persons, single business women, business and professional men with small families working in the downtown area and professional staffs of hospitals and institutions; that rentals range from $67 to $116 per month, down payments $200 to $350 per apartment; that the income limits range from $6,048, maximum for a one-bedroom unit, to $10,500, maximum for a three-bedroom unit; that defendant will spend about $350,-000 to remodel and redecorate said project; that the present schedule for said project is about $48 monthly for a one-bedroom apartment, with maximum income of about $4,320, and about. $64 for a three-bedroom apartment, with maximum income of *601 $5,616, but no down payment; that said conversion proposal is unconstitutional and contrary to chapter 407 of the Laws of 1955, Limited-profit housing companies law, “ the Mitchell-Lama law”; that a limited-dividend housing company known as the Marine Drive Apartments, Inc., has been formed, announcing that the remodelled apartments will be ready for occupancy by September 1,1960; that plaintiff is a member of the Dante Tenants Defense League that has protested this conversion, but defendant refuses to stop proceeding with it; wherefore, plaintiff demands judgment declaring that said conversion plan is unconstitutional, contrary to the Public Housing Law, and defendant should be enjoined.
Defendant’s answer denies most of the material allegations of the complaint, and as an affirmative defense alleges plaintiff has no vested rights that are being injured but has an adequate remedy at law to protect his interests, if any.
The proposal made by defendant in November, 1959 is a comprehensive, logical and fair document of 25 pages. The table of contents covers a background, general outline, benefits, rental housing market in Buffalo, rental market at Marine Drive, location, availability of new housing for transfer purposes, desirability of “ Cooperative Housing” method, waterfront re-development area, location and physical features, recommended betterments, financial feasibility, downpayment schedule and monthly rental rates, dwelling facilities and income ranges.
The proposal states significantly that:
Marine Drive Apartments (formerly known as Dante Place) stand majestically on Buffalo’s waterfront on ground that was once the teeming western terminus of the Erie Barge Canal — an historic waterway connecting the Great Lakes with the Hudson River. In 1950, the Buffalo Municipal Housing Authority acquired this seven acre site and eliminated the substandard tenement buildings, the old taverns, a church that had lost its parishioners, an abandoned grain elevator, and an active paint manufacturing plant. Under a loan and subsidy contract with the New York State Division of Housing and the City of Buffalo, the Authority rebuilt the cleared area with seven 12-story structures to house 616 low-income families and to be operated as a subsidized low-rent public housing development. It was opened for this purpose in October, 1952.
Since the opening of this housing development, significant changes have taken place in the surrounding area. The Buffalo Skyway, a high-level bridge crossing Buffalo River, and the in-city section of the Niagara Thruway have been constructed immediately adjacent to these apartments. In the same period since 1952, the Niagara Frontier Port Authority has been established and the Buffalo Board of Redevelopment has moved forward with plans for an extensive waterfront redevelopment program. These changes have caused the Housing Authority to re-examine this housing development in terms of the shifting focus and future development of the area which surrounds it. * * *
It is recommended that a corporation be formed under the Limited Dividend Housing Companies Law (Article IX of the Public Housing Law of the State *602 of New York) for the purpose of managing and operating Marine Drive Apartments as a modified cooperative development.
* * * The corporation in turn would enter into a long term lease with the Buffalo Municipal Housing Authority for the entire physical facilities of Marine Drive Apartments. The Buffalo Municipal Housing Authority would retain title to the property and would remain obligated under the existing Loan and Subsidy Contract with the State of New York for the debt service required in the retirement of the State bonds already issued. The lease agreement with the Housing Company would provide for a semi-annual lump sum payment to the Housing Authority sufficient to meet the annual amortization and interest on its bonds and such other statutory obligations under the Loan and Subsidy Contract.
Under the lease, the Housing Company would have complete responsibility and jurisdiction for the management, maintenance and operation of the development and the rental of the apartments. A degree of public control would remain, however, in that the Limited Dividend Housing Companies Law requires (among other things) that the State Commissioner of Housing approve rent schedules and income limits of the tenant occupants (the same provision that exists in the State’s Limited Profit or Mitehell-Lama Program). Operating funds of the Housing Company would come solely from the monthly rental of the apartments, plus such other revenue as is received from the rental of non-dwelling space. There would be no State subsidy such as prevails in the low-rent public housing operation.
In addition to the monthly rental charge, tenant occupants would be required to make a down payment or occupancy deposit as members of the cooperative. Unlike other cooperatives, however, tenants would not hold equity shares in the physical property but rather a share in the leasehold. This avoids a factor of complication and permits the down payment or occupancy deposit to be fairly nominal. This absence of equity interest also eases the handling of future turnover. A share in the Housing Company would, however, give a tenant stockholder a vote in the affairs of the company that require stockholder action.
Following the formation of the Housing Company and the establishment of its operation, the initial directors would be gradually replaced by occupants of the apartments and, thus, eventually become a completely self-controlled cooperative unit. Savings accomplished in the operation and maintenance would be directly reflected in a possible reduction of rental charges and there would be self-discipline in the selection of new tenants or cooperative members. The supervision of the State Commissioner of Housing, however, would remain as provided under the law.
The City of Buffalo is a full third party to the Loan and Subsidy Contract which authorized the original construction of this development. Under existing conditions and in accordance with the Loan and Subsidy Contract, the City and the County receive taxes only on the value of the land and the structures that-existed at the time the site was acquired. Under the Housing Company operation and with middle-income families as an objective, the monthly rental charges will be at a level to permit a tax payment to the City and County on 50% of the normal assessment of the total improvement. * * * The directors of the Housing Company would set the exact admission requirements. Present occupants of the project who meet the eligibility standards of the Housing Company would have the opportunity to remain under the Housing Company operation. * * *
Significant changes have taken place in the last 25 years in the low-income housing market served by public housing. These changes result largely from *603 the expansion of the economy, particularly since the end of World War II. The median income of Buffalo’s renter families rose from $3,210 in 1949 to $4,415 in 1954 — an increase of 38 per cent. A striking change was the sharp upward movement of family income in the category below $3,000, the market traditionally served by public housing. In 1949, a total of 43 per cent of Buffalo renter families had incomes under $3,000; in 1954, only 19 per cent.
Although public housing income limits were raised periodically to reflect changes in income, this rise has not been sufficient to meet the dramatic jump in the economy as a whole. 9 °

Availability of New Public Housing Facilities for transfer Purposes.

The completion of Talbert Mall, a 763-unit public housing development, for occupancy in October, 1959 makes available a strategic housing resource for the transfer of existing families from the public housing development. Such transfer could be accomplished in a short time and with a minimum of inconvenience. & c
Marine Drive Apartments is located in a strategic position in relation to the waterfront redevelopment program planned by the Buffalo Board of Redevelopment. * * *
It is recommended that the company be organized with a capital stock authorization of $100,000. This would represent 4000 shares of common stock at the par value of $25.00 each. The stock would be issued to the tenant ‘ cooperators ’ by subscription and in relation to the downpayment on each apartment. Each tenant stockholder would thus have a vote in" the affairs of the company that require stockholder action. Proceeds from the stock subscription would be held by the company as working capital and/or debt service reserve. ®
When the outstanding bonds are fully amortized (a date assumed to be coincidental with the term of the lease to the Housing Company) the development could be sold outright to the Housing Company or otherwise disposed of in the best interest of the City of Buffalo. 0 6 c
The proposed monthly rental rates have been calculated to include heating and hot and cold running water.
The proposed downpayment scheduled is in multiples of $25.00 for which the tenant occupants would receive shares in the cooperative at the rate of $25.00 per share.
A supplement to the proposal dated April 26,1960 states:
This can be no more forcefully illustrated than to point out to you that Dante Place has a density of more than 400 persons to the acre of project site. Our dedication, to families with children in public housing made this unavoidable in relation to the close planning of the site and structures. Yet, no other public housing development in the .City comes within 50 percent of such a density. Nor can the density at Dante Place be satisfactorily reversed under a subsidized public housing operation. 9 9 u
Years of procrastination in our approach to the whole waterfront demands a bold demonstration that this is a desirable, liveable area for non-subsidized, taxpaying housing. The ultimate success of waterfront redevelopment depends upon it. The realization of this fact contributed to the conclusion that the conversion of Dante Place represents the key demonstration in this direction and would provide immeasurable stimulus for further development of the area. 6 9 *
Finally, there is the practical consideration of both short range and long term financial benefits to the City. The leasing of the project to a Limited *604 Dividend Company will result in an immediate increase in tax revenue to the City of more than $50,000 annually. It further holds forth the prospect of returning to full tax return status in a period of about twenty years as the Authority reduces its bonded debt through payments by the Limited Dividend Company. Potential financial benefits can also be measured in the impetus that will be given to waterfront renewal and the development of additional new housing in the central City.
The proposed schedule of monthly dwelling unit rentals, maximum income limits and down payments start at monthly rental of $67, down payment of $200, income limit at 6:1 ratio of $5,328, proceeding to the highest monthly rental of $116, down payment of $350, income limits at 6:1 ratio of $9,000 or 7:1 ratio for income limits of families of five or more persons totaling $10,500.
Plaintiff contends in his brief that: ‘ ‘ Finally, the greatest vice of the conversion plan lies in its provision to eschew the present tenants, in favor of others for whom it is said the structures are more adaptable.” The defendant’s answer to this is page 5 of the November, 1959, proposal that: “ Present occupants of the project who meet the eligibility standards of the Housing Company would have the opportunity to remain under the Housing Company operation.”
The New York Constitution provides in article XVIII, entitled “Housing ”:
“ [Housing for persons of low income; slum clearance.] Section 1. Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing for persons of low income as defined by law ”. (Adopted and approved, 1938.)
“ [Loans and subsidies; restrictions on and preference in occupancy of projects.] § 6. * * * The occupancy of any such project shall be restricted to persons of low income as defined by law and preference shall be given to persons who live or shall have lived in such area or areas.” (Adopted and approved, 1938.)
“ [Power of legislature; construction of article.] § 10. * * * Nothing in this article contained shall be deemed to authorize or empower the state, or any city, town, village or public corporation, to engage in any private business or enterprise other than the building and operation of low rent dwelling houses for persons of low income as defined by law”.
The New York Public Housing Law (L. 1939, ch. 808, as amd.) provides:
*605 “ § 3. Definitions. * * * 18. The terms 1 persons of low income ’ and ‘ families of low income ’ mean persons or families who are in the low income groups and who cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings. * * * 23. The term 1 low rent housing ’ means dwellings within the financial reach of families of low income and embraces recreational and other facilities incidental and appurtenant thereto.”
‘ ‘ 17. Occupancy preference. The occupancy of any state project shall be restricted to persons of low income and preference shall be given to persons who live or shall have lived in the substandard or insanitary area or areas which have been or will be cleared, replanned, reconstructed or rehabilitated pursuant to a plan.”
“ 132. Purchase or lease of projects. A housing company may purchase or lease a project or part thereof from an authority or a municipality. The sale or lease shall be upon such terms, including limitation of rentals, regulation of occupancy and reentry by the authority or by the municipality, as may be agreed upon by the housing company, with the approval of the commissioner and the authority or municipality.”
“ § 156. Selection of tenants. Subject to the terms of any loan or subsidy contract with a government, an authority shall have the power to select tenants for its projects. It shall observe the following standards with respect thereto:
“ 1. The dwellings in the project shall be available solely
“ a. for persons or families of low income whose probable aggregate annual income during the period of occupancy does not exceed six times the rental (including the value or cost to them of heat, light, water and cooking fuel) of the dwellings to be furnished such persons or families * * * and until December thirty-first, nineteen hundred sixty-one.”
“ 5. Priority and preference in the rental of apartments in any project shall be given to eligible persons and families residing within a radius of one mile of such project, without regard to race, religion, color or national origin, in order to preserve the roots of such persons and families who have ties and other interests in a particular community, church, synagogue, settlement house, hospital or medical or dental services and facilities within such area; but nothing herein contained shall be construed to grant such priority and preference until all eligible persons and families entitled to priority and preference by virtue of their status as site tenants or veterans, shall first have been admitted as tenants in such project.” (As amd. by *606 L. 1956, ch. 493, § 1; L. 1957, ch. 981; L. 1958, ch. 649; L. 1959, ch. 496, eff. April 16, 1959; L. 1959, ch. 651, § 1, eff. April 21, 1959.)
Article XII. Limited-Profit Housing Companies Law. (L. 1955, ch. 407, as amd. by L. 1956, ch. 877; “ Mitchell-Lama Law ”.)
“ § 302. Policy and purposes of article. It is hereby declared that there exists in municipalities in this state a seriously inadequate supply of safe and sanitary dwelling accommodations for families and persons of law income, including aged persons ■ of low income ”.
“ § 318. Rentals and selection of tenants. # # * 2. The dwellings in a company project shall be available for persons or families of low income whose probable aggregate annual income at the time of admission and during the period of occupancy does not exceed six times the rental, including the value or cost to them of heat, light, water and cooking fuel, of the dwellings that may be furnished to such persons or families, except that in the case of families with three or more dependents, such ratio shall not exceed seven to one. The 1 probable aggregate annual income ’ means the annual income of the chief wage earner of the family, plus all other income of other adult members of the family, plus a proportion of income of gainfully employed minors, the proportion to be determined by the company as approved by the commissioner in the case of a state-aided project or the municipal comptroller, in the case of a municipally-aided pro j ect. ’ ’
“ 6. Preference in admission to a project shall be given to families displaced by a limited-profit housing project.” (As amd. by L. 1956, ch. 877, § 19; L. 1957, ch. 750, § 2, eff. April 19, 1957.)
The Federal Government has enacted a Low-Rent Housing Law (U. S. Code, tit. 42, ch. 8), section 1402, “Definitions,” providing:
“When used in this chapter * * * (2) * * * The term ‘ families of low income ’ means families who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or metropolitan area to build an adequate supply of decent, safe, and sanitary dwellings for their use.” (Emphasis supplied. Sept. 1,1937, ch. 896, § 2; 50 U. S. Stat. 888, as amd.; U. S. Code, tit. 42, § 1402.)
It will be noted, in passing, that the New York Constitution and Public Housing Law refer to “ low income” while the Federal statute refers to “ lowest income.” Obviously, there is a marked distinction between the two. Apparently, ‘ ‘ low *607 income” should not rise to “high income,” and “lowest income” to “low income.” Low is an adjective of highest degree; it descends to lower, then lowest; it means, as used here, “ Beneath the usual or remunerative rate or amount * * * as ® ® * low wages ” (Webster’s New International Dictionary, 2d. ed.); its antonyms of opposing meaning are, “ High, exalted, elevated, superior.” {Ibid.)
Standards of income and rent vary in different communities, in peace and war times, thus the general definitions of the Legislature in the Public Housing Law leaving their application to the local authority are constitutional. (Davidson v. City of Elmira, 180 Misc. 1052,1057, affd. 267 App. Div. 797, motion for leave to appeal denied 292 N. Y. 723; approved in Kaskel v. Impellitteri, 306 N. Y. 73, 81.) The Mitchell-Lama Law (Public Housing Law, art. 12) is not unconstitutionally applied to a plan for public housing that appears to benefit a 1 ‘ middle income group ” as long as the income is not sufficient to produce that rental which attracts private industry to build housing for persons such as those in the City-of New York of annual income of $7,000. (Minkin v. City of New York, 24 Misc 2d 818.) In the New York State statutes the term used is “ low income ” and not “ lowest income ” as is found in the Federal statutes. These terms are relative and variable. (Borek v. Golder, 190 Misc. 366, 394.) The court takes judicial notice of the great increase of incomes and building costs since World War II. (Neufeld v. O’Dwyer, 192 Misc. 538, 542.)
Unless the taxpayer shows illegality or fraud, the court will not pass judgment upon legislative policy or administrative discretion. (Campbell v. City of New York, 244 N. Y. 317, 328.) Where men of training and experience honestly differ on the question of what constitutes ‘ ‘ low income ’ ’ and ‘1 low rent ’ ’ at a given time and place, the court should not take away the right and power of the local authority to determine what they should be. (Boro Hall Corp. v. Impellitteri, 128 N. Y. S. 2d 804, 806, affd. 283 App. Div. 889, motion for leave to appeal denied 307 N. Y. 672.) Although a tenant may suffer inconvenience and financial loss through forced removal, nevertheless the landlord is not denied possession thereby. (Wolfe v. United States Housing Auth., 36 F. Supp. 580, 584; Rudder v. United States, 105 A. 2d 741, 745 [D. C.].)
Here, plaintiff and his cotenants have not suffered and will not suffer irreparable injury. The plaintiff complains that his removal from the project will affect grammar school children who will have to change schools and will injure tenants’ furniture in transit. While there inconveniences are not pleasant. *608 they are, none the less, incident to any moving of a home from one school district to another, and thus, the incidents of living in a populous community.
Buffalo has undergone great changes in population. In 1900, Buffalo was ninth largest city in the nation with a population of 352,387; in 1910, tenth, 423,715, increasing 71,328; in 1920, eleventh, 506,775, increasing 83,060; in 1930, thirteenth, 573,067, increasing 66,992; in 1940, fourteenth, 575,901, increasing 2,834; in 1950, fifteenth, 580,132, increasing 4,231; in 1960, twentieth, 528,387, decreasing 51,745. In the last 30 years Buffalo has failed to attract new residents; it has failed to grow apace its former record or other American cities; in fact, from 1950 to 1960 it has lost 51,745 residents and has fallen to twentieth position among United States cities. It is said that Buffalonians are moving outside the city into suburban areas so that the metropolitan area is still growing. In any event, they are leaving the city and it is reasonable to assume that inadequate housing is one of the substantial causes.
With the growth of population outside Buffalo, a new suburban marketing development has followed the potential buyers so that the modern shopping plazas with abundant free parking space for automobiles have been built.
The downtown business area in Buffalo has felt this exodus. Large department stores and specialty shops are moving or closing; some new office buildings, the first in some 25 to 30 years, are being built. Old buildings are being replaced by new. This is going on within several hundred feet of the project and conversion involved in this ease.
In 1952, when the Dante Project was built, it met the dual need of slum clearance and low-rent housing. Today, the conversion to the “ Cooperative Housing ’’methodis a step forward with the proper planning to a better Buffalo that will benefit everyone in Buffalo, including the plaintiff. This lakefront housing located at the new “ crossroads,” created by the intersection of the New York Thruway and the Hi-level Bridge, may not become New York City’s Riverside Drive, but it has great potential per se and as a model for private enterprise in the future.
Calling 1 ‘ low income ’ ’ by the name of ‘1 middle income ’ ’ does not change the ultimate fact that the “ maximum income limits ” proposed in this case are “ low income ” at this time and place. As one gifted bard put it: “ What’s in a name? That which we call a rose by any other name would smell as sweet. ’ ’
Finally, this proposal to convert Dante to Marine is not a scheme to evade the law, but a scheme to comply with the law.
*609 There is no bona fide issue of fact created by the pleadings. As a matter of law, the complaint does not state a cause of action.
Plaintiff’s motion for injunction denied; defendant’s motion for summary judgment granted, dismissing the complaint. No motion costs.