Breitel, J.
The issue in this case turns on the breadth of meaning of the term “ project ” in the Public Housing Law. Appellants attribute to the term “ project ’’ a particular meaning which would require resubmission for approval to the New York City Board of Estimate of a project modified since the prior approval by the board. Respondents, on the other hand, would give the term a broader and, therefore, a vaguer rendering, thus making unnecessary a reapproval because of modifications. While the issue in litigation is phrased in technical terms and embraces the arts of statutory interpretation, the *171 issue beneath the issue is whether a public housing project planned for a community may be unshaken from its prior approval and defeated on another run-through the board, the community having become more articulately aroused and antagonistic to the project in the latter days.
The judicial process is not charged with the power or the responsibility of determining the desirability of the project or its location. That power and responsibility rests elsewhere. The judicial process is limited in the present context to the technical issue whether the project by being changed required a new approval. For the reasons to be discussed, it is concluded that the statutory terms are broad indeed, and if not broad, would be vague and absent in standards of interpretation, which would in any event preclude a court from requiring a submission for a new approval because of modifications in the project.
Special Term, New York County, granted plaintiffs a favorable declaratory judgment and an injunction in a taxpayers’ action to bar the public housing project planned for Forest Hills in Queens County. The Appellate Division unanimously reversed.
The project is a proposed public housing development, to be largely financed out of Federal funds, and to contain, in its various modifications, 828, 840, or 848 housing units. The earliest project was designed to contain one 22-story building, three of 12 stories, and three of 10 stories. The last intention is to erect three buildings, each of 24 stories. Much is also made of the proposed change from 248 to 341 units to be allotted to the aged.
There can be no abiding controversy about the number of units in the project requiring reapproval, or those allotted to the aged. The substantial controversy is over the shifting from a seven-building project to a three-building project, plaintiffs insisting that the change is so great as to make the project a different one from that originally approved.
Some underbrush should be removed. The impact of the project on the Forest Hills community is not the nupaber or size of the buildings. They were always tall buildings, and only a short time ago would have been regarded as gargantuan even in the “ smaller ” version. The case does not involve a substitution of high-rise buildings for a low-level o^ dispersed *172 development. However one views the project* plaintiffs have not shown how the different physical designs would have any impact on the community. In short, it has not been shown that its physical qualities threaten the esthetics, the safety, or the convenience of the community. Hence, the technical issue is a technical one even to those who raise it. The real issue, as suggested earlier, is 'the impact on the community of so, vast a public housing project, aggregating over 800 units to be occupied by low-income people, threatening to impair the middle class “life-style ” and security of the surrounding area; but that was always so, even when the “ smaller ” version was projected with its high-rise buildings. And, indeed, the increase in uses allotted to the aged in later design would decrease rather than increase the feared negative impact on the community. But this real issue is one that has been foreclosed by the prior approval by the Board of Estimate, and plaintiffs do not question that.
It is bootless to detail the events which led up to the controversy. It is enough that the early version, after considerable opposition, was approved as a plan and a project (the statute distinguishes between the two) by the City Planning Commission and the Board of Estimate. This was in 1966. By 19*70 the project was changed in a series of modifications. The number and height of the buildings were markedly changed; the prospective occupancy represented in the number of units was not.
Section 150 of the Public Housing Law is the statute requiring approval both of the plan and the project. Section 3 of the Public Housing Law defines a plan broadly as an undertaking for the clearance and replanning of an area. It defines a project as the specific work or improvement, including of course the buildings, to effectuate the plan. Qualifications there are in the definitions but no limits or standards to demark either the plan or the project.* The criteria for approval are not expressed.
*173 It is in this state of the statutory language that one must determine what in essence has been approved in the action by the board on the project, and whether new approval is necessary because the essence has been changed. All agree that nonessential changes do not require reapproval (cf. Matter of Tinsley v. Monserrat, 26 N Y 2d 110,114). The parties do not agree as to what is a change in essence, and the statute says nothing on that score because it does not limit or standardize the terms used or the process of approval.
In such circumstances the task of interpretation generally, and the application of the statute in the particular context, are best served by considering the issue functionally in the very context in which it has arisen. The only alternative would be to abandon the statute as too vague to authorize review of changes after approval, a resort to be avoided and of no help to plaintiffs.
Viewing the issue in a functional frame of reference the change in the number and height of the buildings is not a material one. Quite different, for one example, would be a change from a garden apartment scheme to high-rise, vertical elevator buildings. This is not to say that there is no great difference between seven smaller buildings and three larger buildings. There is, but in this project that is not the pervading motif over which there is controversy. The issue is not an esthetic one, although it might have been; nor is the issue architectural disharmony with the area, although that too might have been. On this view the change in project is not an essential or significant one and the Appellate Division was correct in its conclusion.
A possible essential issue might have been the number and quality of the tenant population planned for the project, but for the reasons already indicated that essential aspect of the project was approved and has not been materially changed.
*174 - Again, it is necessary to emphasize that the issue in the ease is a narrow one depending upon the reading of a statute offering no standards for the approval of a plan or project, as distinguished from justifying purposes. True, in any case approval by the planning body and local legislative body is required and, true too, such approvals originally offered opportunity to resist the project for any reason, whether aggregate population, Or kind, number, and size of buildings. But the fact is that in context the changes which have been made have not changed the essence of the project as it was conceived and approved or on any ground now offered except that the buildings are architecturally so different as to make the project a different one. Most important, the changes questioned in the litigation, as distinguished from the very real considerations in the background, have not been shown to have any significant impact on the community, now, or would have had at the time of approval by the board. That is not enough.
Finally, the remedy, if there should be one for the serious community conflict which has arisen, is not to be found within the recesses of the statute providing for approval of plan and project. The approval process was never contemplated to prevent nonessential changes in the project design nor for the community or "anyone else to change in essence or stop altogether a project once approved. The remedy to change this project, if that should be, is no longer in the hands of the local legislative body or the courts, but with the administrative branch of the city, politically responsive to the people of the city and the community within it. The situation is no different than with any other act of government proposed by an executive agency and approved by. a legislative body.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

 The definitions included in section 3 read as follows:
“ 13. The term ‘ plan ’ means a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and insanitary area or areas and for recreational and other facilities incidental or appurtenant thereto to effectuate the purposes of article eighteen of the constitution or any
*173 other provision of the constitution delegating any similar power or providing homes for persons of low income.
“14. The term ‘ project ’ means a specific work or improvement to effectuate all or any part of a plan. The term shall include the lands, buildings or any dwelling units therein; and improvements acquired, owned, constructed/- managed or operated hereunder, to provide dwelling accommodations for persons of low income, and such stores, offices and other non-housing facilities as well as social, recreational or communal facilities, as may be deemed by the authority or municipality to be incidental or appurtenant to a project ”,