## Coalition for Responsible Planning, Inc., et al., Petitioners, v Edward I. Koch et al., Respondents.

Supreme Court, New York County, November 10, 1988

### APPEARANCES OF COUNSEL

*Richard F. Braun* for petitioners. *Peter L. Zimroth, Corporation Counsel (Jeffrey Shanback* of counsel), for Edward I. Koch

and others, respondents. *Lord Day & Lord, Barrett Smith (William O. Purcell* of counsel), for Real Estate Board Housing Development Fund Corporation and another, respondents.

## OPINION OF THE COURT

DIANE A. LEBEDEFF, J.

Pursuant to CPLR article 78, petitioners apply for an order annulling three Board of Estimate resolutions approving the development of a 10.22-acre parcel of city-owned vacant land as a housing project with $50 million of public funds. The challenges pose familiar land use issues: environmental impact statements, uniform land use review planning (ULURP) procedures, and the propriety of the project under applicable housing statutes.

The site straddles the Bronx-New York County line as a result of a 1892 public engineering project which built the Harlem Ship Canal, detaching land from Manhattan and, with the help of landfill, welding it to the Bronx mainland. The site itself is the former creek bed. New York City became owner of the land, which is adjacent to John F. Kennedy High School, following a 1974 condemnation for school and recreational use.

On June 1, 1987, the Department of City Planning started the ULURP and environmental review processes. It issued a draft environmental impact statement (DEIS) analyzing a proposal for 1,001 condominium units in two buildings with interconnected wings of heights from 6 to 15 floors, parking for 700 cars, and 16,000 feet of commercial space. The two alternatives considered in the DEIS were "no build" and an educational park use. Reviewing that proposal, Community Board No. 8 of The Bronx unanimously found it "utterly flawed" and stressed an urgent need to remedy the extreme shortage of school space in the community.

Even before the ULURP and DEIS circulation, the district's overburdened schools were in issue. The developer expressed early concern that community feed-back indicated a very serious school concern. Community Board No. 12 of Manhattan had voted against a nonschool use for the site.

After City Planning Commission public hearings, a final environmental impact statement (FEIS) was issued. The alternatives in the FEIS were "no build," an educational park, a plan combining 500 residential units with community use which was reported to be impractical, and, discussed in

slightly more than one page, a mixture of 750 units with some institutional use.

In November 19, 1987, the Board of Estimate approved a plan providing accommodations for 750 families, fewer parking spaces, and a separate recommendation for a 600-seat elementary school. The Board of Estimate's recommendation of school space is to be the subject of a separate ULURP process.

### ENVIRONMENTAL IMPACT STATEMENTS

Environmental impact statements were prepared here as required under ECL 8-0109 for all State and local government agency actions which may "have a significant effect on the environment". With the support of experts, petitioners attack both the draft and final impact statements for insufficiently or inadequately analyzing several topics, object that mitigating alternatives were not thoroughly considered, and urge that there must be an analysis of the alternative finally adopted.

There are specific challenges to the analysis of street traffic, potential earthquakes, methane gas, and possible gentrification of the community and exclusion of current residents. The purpose of a draft impact statement is to take a "hard look" at the proposal and to provide sufficient detail to guide the final decision makers. *(See, Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Aldrich v Pattison,* 107 AD2d 258; *Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 492, *affd* 60 NY2d 805.)

The court has read both the draft and final statement and finds that the "hard look" has been taken. As to the failure to consider earthquakes, an impact statement need not weigh this factor for it was not raised by comments prior to issuance of the final report. *(Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 427.) Accordingly, these specific challenges must be rejected.

The court does not minimize that serious issues are presented on the environmental front, especially when considering the impact of the project on the existing community. The reports unquestionably disclosed items of special concern:

The school district is the second most crowded in New York City, with some schools at 50% over capacity. As of October of 1987, elementary schools in the district were overburdened by 3,582 students, more than 5,705 elementary students were schooled in annexes and "mini-school" facilities in noneduca-

tional space, the high school operated at three shifts, and there had been no implementation of the prekindergarten program. Noise levels near the high school almost reached a level inconsistent with classroom learning. There were few viable proposals for school expansion.

Traffic at nearby intersections was near gridlock. The formal side street was so clogged with double-parked cars that pedestrians resort to foot travel in the street. The Fire Department, after considering traffic on the side street and access road, asked for access to the high school behind the project over proposed landscaped public areas.

Public park space in the sector is in critically short supply. A chart in the FEIS notes that "Gross deficiency in open space conditions [exist] in area" (III-3).

The targeted occupants of the new housing would have incomes well above the median income of the area. The proposal for 1,001 units would have added 7% to the area's population, and been more than double the size of any building absorbed into the community since approximately 1952.

A small natural "wetland" area would be destroyed.

Notwithstanding these disclosures, a reader of the full draft and final impact reports would conclude that they heavily favored building the 1,000-unit housing project.

The Board of Estimate, the decision-making body, by its action rejected the certification attached to the final environmental impact statement and found a need for further mitigation. It approved a smaller and lower project of 750 units in two buildings ranging from 13 to 3 stories in height. By setting aside 100 units for senior citizens, who may not have school-age children in their households, it lessened the projected impact on the already burdened school system. By calling for the construction of a school, school overcrowding would be reduced by 600 elementary school seats.

Petitioners urge the modifications require that a supplemental environmental impact statement (SEIS) be prepared. A supplemental impact statement was explained by Justice Kaye in *Matter of Jackson v New York State Urban Dev. Corp., (supra,* at 429-430) as follows: "While strict compliance with prescribed procedures is required, nothing in SEQRA or its regulations expressly calls for issuance of an SEIS. Indeed, a supplemental statement is not even mentioned. However, an agency making a final decision about a project must make findings that the environmental concerns of the act have been

considered and satisfied * * * and from this it may reasonably be inferred that *an agency must prepare a SEIS if environmentally significant modifications are made after issuance of an FEIS.* * * * Whether or not a modification is significant is generally a decision to be made by the agency after taking a 'hard look' ". (Citations omitted; emphasis added.) The determination of the need for a supplemental impact statement is the responsibility of the agency making the determination. *(Matter of Jackson v New York State Urban Dev. Corp., supra; Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1037 [2d Cir]; *L.S.S. Leasing Corp. v United States Gen. Servs. Admin.,* 579 F Supp 1565, 1574 [SD NY].)

The court must conclude, based in city procedures and the record, that the "hard look" at the need for a supplemental impact statement plan was not undertaken. No record of a SEIS "hard look" is presented. Further, under New York City environmental procedures established by Executive Order No. 91, the Board of Estimate is not empowered to make environmental determinations and could not have done so here. *(See, in accord, Matter of Coca-Cola Bottling Co. v Board of Estimate,* NYLJ, Nov. 26, 1986, at 7, cols 1-2 [Sup Ct, NY County], *affd on decision below* 135 AD2d 404, *lv granted* 72 NY2d 803, also cited in Weinberg, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17½, ECL 8-0111, 1988 Cum Ann Pocket Part; *see,* disapproving delegation to non-decision-making body, *Glen Head—Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 491-493.)

A SEIS, as any environmental impact statement, must be prepared administratively: "Where environmental matters are involved, as in the instant proceeding, it is particularly important to allow the administrative agency possessing the requisite expertise to exercise its authority to hear the evidence on the issues, make findings and state the reasons for its action on the record prior to judicial review of the determination." *(Aldrich v Pattison, supra,* 107 AD2d, at 268.) A remand is necessary in order to allow that administrative assessment.

The court is not asked to, nor could it, assess the environmental impact of the modified project. The configuration of the project has not been presented. There are no means available to consider the safety of school children on sidewalks crowded with cars, explore street widening or additional access roads, consider preservation of the wetlands, or weigh the impact of construction noise on the high school.

Given that there will be a further environmental review, consistent with *Webster Assocs. v Town of Webster* (59 NY2d 220, 228), alternatives must be examined in sufficient detail "to aid * * * in assessing the relative costs and benefits * * * [and] an awareness of all reasonable options". The harmless error found there in not elaborating the differences between two massive shopping malls within one-half mile of each other cannot be compared to the complex choices between the many alternatives available here.

The conclusion requiring further governmental action is in accord with the treatment of significantly revised plans in many areas of governmental function. *(See,* new hearing, *Matter of Tinsley v Monserrat,* 26 NY2d 110, 113 [school redistricting plans]; *compare,* no further hearings, *Horn v International Business Machs. Corp.,* 110 AD2d 87, 91, 97 [Town Board had supplemental information prior to the conclusion of public hearings]; *Margulis v Lindsay,* 31 NY2d 167, 173 [not shown changes significant to community]; *Matter of Lower E. Side Joint Planning Council v New York City Bd. of Estimate,* 56 NY2d 717, 719 [set aside of 100 already planned apartments for the elderly]; *Starburst Realty Corp. v City of New York,* 125 AD2d 148, 157 [change had no land use impact].)

In summary, once a court determines, as it does here, that the environmental process has not been followed, a court must determine that the action "does not comply with the statutory mandate and therefore is arbitrary and capricious." *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 368.) Based upon the foregoing, the court so finds and grants the relief requested by petitioners.

The court suggests that community involvement in preparation of the SEIS would provide meaningful insight. *(See, The Role of Amenities In the Land Use Process,* 43 Rec AB City NY 653, 670.) Community involvement will be required in the ULURP review of the school project and this further review may be able to proceed in the same time frame.

### INTERAGENCY SITE TRANSFER

Petitioners allege error because two interagency transfers of this site took place in violation of New York Board of Estimate Resolution No. 44, passed on December 4, 1986. Resolution No. 44 provides that when real property owned or leased by New York City, other than leased office space, is trans-

ferred between city agencies and "where a change in use, activity, function or operation will ensue," such an assignment must be submitted to the Uniform Land Use Review Procedure (ULURP).

Respondents' primary contention is that Resolution No. 44 was adopted in violation of section 197-c of the New York City Charter. Section 197-c sets forth categories of land use and development which require submission to ULURP. Transfers of land, and change in the use of land as a result of assignment from one city agency to another are not included within the categories specifically enumerated in section 197-c, which, before the passage of Resolution No. 44, was held not to require ULURP scrutiny of interagency land use dealings. (*Maudlin v New York City Tr. Auth.*, 64 AD2d 114, 117.)

The Board of Estimate found authority for Resolution No. 44 in subdivision (a) (11) of section 197-c, which permits ULURP procedures to be imposed for "[s]uch other matters involving the use, development or improvement of property as are specified by the board of estimate upon recommendation of the city planning commission." Respondents contend that the resolution is a nullity in that the City Planning Commission recommended against the adoption of the resolution.

This court finds that respondents' attack is not supported by the New York City Charter. The Charter is a statute (McKinney's Cons Laws of NY, Book 1, Statutes § 351), and is subject to the general principles of statutory construction: "It is a fundamental rule of statutory construction that a statute or legislative act is to be construed as a whole, and that all parts of an act are to be read and construed together to determine the legislative intent" (McKinney's Cons Laws of NY, Book 1, Statutes § 97). The Board of Estimate has "final action" on any developmental plan approved, disapproved, or approved with modifications by the City Planning Commission (NY City Charter § 197-a). The Board of Estimate may override the Commission's disapproval by a three-fourths vote (§ 197-a). It did so when it adopted Resolution No. 44 by more than a three-quarters vote.

The court finds no error in the adoption of Resolution No. 44. This holding is in accord with the judicially recognized principles of *Maudlin v New York City Tr. Auth.* (*supra,* 64 AD2d, at 117), that "the provisions of 197-c of the charter should be liberally construed", and of *Matter of Board of Educ. v City of New York* (41 NY2d 535, 538), that "respectful

constraint" be accorded by courts to legislative actions of the Board of Estimate.

Further, there is public policy support for the position taken by the Board of Estimate. The Board adopted this additional ULURP review provision after 1984 City Planning Commission disapproval because, as recited in the resolution, "the Board has continued to observe dramatic land use changes [and] the problems of finding sites for controversial uses should not lead to avoidance of comprehensive planning and public review." The same concern for early public debate is echoed in environmental procedures which require review when "a definite course of future decisions" is set, even before a specific proposal is drafted, which appears to be comparable to an early ULURP stage. (Matter of Kirk-Astir Dr. Neighborhood Assn. v Town Bd., 106 AD2d 868, 869, citing numerous cases; see, as to coordinated ULURP and environmental review, ECL 8-0107, and Executive Order No. 91, § 10 [c] [4].)

Respondents then urge as an excuse for noncompliance with Resolution No. 44 that it does not apply because the Board of Education resolved to transfer the property to the General Services Administration (GSA) prior to passage of the resolution. This argument has no apparent application to the later transfer without ULURP review from GSA to the Department of Housing Preservation and Development.

This attack on the need to submit the first transfer to ULURP is based upon the theory that the delay of the transfer was ministerial and should be disregarded. However, the record shows that, during the time between the resolution and the transfer, the Board of Education made substantive decisions regarding what land it would retain before the transfer was accepted and completed. (See, as to acceptance governing the effective date of a land transfer, 6A Powell, Real Property ¶ 892 [1987].) Therefore, this argument is found inapplicable to these facts and not a sufficient excuse to avoid ULURP review.

Respondents' other arguments have been considered and found without merit. In any event, further ULURP review is necessary because the Board of Estimate revisions were more than "minor modifications," which mandate resubmission of the revised proposal to the ULURP process. (Matter of Lower E. Side Joint Planning Council v New York City Bd. of Estimate, 83 AD2d 526, 527.)

It does not elevate form over substance to require that a

lawfully mandated procedure be followed. Based upon recognized principles of law, it is concluded that the two interagency transfers and the modified proposal must be submitted to ULURP review.

Accordingly, the petition is granted to the extent of annulling Board of Estimate Resolutions Nos. 28, 29 and 32 of November 29, 1987, in that they were affected by errors of law, and the respondents are enjoined from further proceeding with the project until full ULURP compliance is achieved.

### PRIVATE HOUSING FINANCE LAW PROVISIONS.

Several arguments are raised by petitioners attacking the housing aspects of the proposal. The petitioners' primary contention is that articles 11 and 12 of the Private Housing Finance Law are intended to benefit "low"-income families and persons and it is improper for the project to benefit persons and families with annual incomes of $15,000 to $48,000.

The Private Housing Finance Law's definitional section 2 (19) defines the group to be benefited as "in the low income groups and who cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings," a language which courts have recognized as a "relative and variable" test. (Chelcy v Buffalo Mun. Hous. Auth., 24 Misc 2d 598, 607; Minkin v City of New York, 24 Misc 2d 818 [both in relation to a comparable provision of the Public Housing Law].) No language appears in Private Housing Finance Law articles 11 and 12 which would allow adoption of another definition.

Moreover, specifically in regard to this program, in the Housing New York Program Act (L 1986, ch 32), which is related to article 12 of the Private Housing Finance Law, the State Legislature indicated approval of subsidized housing for households earning up to 175% of area median income. Given the long-standing judicial interpretation of this phrase, and the recent expression of legislative intent, this court must reject the argument that the statute requires a particular lower monetary income level.

Petitioners submit an affidavit of a single local real estate broker that "sufficient housing" is available to meet the needs of middle-income persons. That demonstration is not sufficient in itself to serve as a basis to challenge the determination that

sufficient housing is not available in the area or in the municipality.

As to the argument that the Private Housing Finance Law does not permit the development of a condominium, but only rentals or cooperatives, the statutes cited (Private Housing Finance Law §§ 571, 573 [3], [4]; § 576 [1] [a], [b]; § 577-a [a]) provide no support for that position. Further, section 2 (27), when defining "total carrying charges" does include the status of people "living in a project * * * in perpetuity" and equates "rental" with such carrying charges, which gives support to the position that condominiums are permitted for Private Housing Finance Law programs. It is also noted that the Commissioner of the Department of Housing Preservation and Development (HPD) has advised that the use of a condominium structure is not novel and has been used by other Private Housing Finance Law article 11 projects.

There is also an objection that 25% of the units initially can be sold without any income restrictions. However, that eventuality will occur only to the extent of and subject to HPD certification that the developer would otherwise have a financial loss on the project. This condition is in accordance with section 654 (20) of the Private Housing Finance Law, which allows variation of the rental rate by the supervising agency to secure sufficient project operational income, and is reasonably adapted to the conditions here. The objection to resale without income limitations is met by the city's plan to recapture the public investment through liens, as well as being part of a policy which encourages home ownership.

Petitioners have failed to establish that defendant Real Estate Board Housing Development Fund Corporation was not properly organized as a not-for-profit corporation pursuant to the provisions of Private Housing Finance Law § 573 (1) (b). The sale is, in any event, pursuant to article 16 of the General Municipal Law.

Based upon the foregoing, petitioners have failed to raise an argument which would defeat the proposal under applicable housing laws.

CONCLUSION

The conclusions reached will require further governmental and community review regarding the use of two rare resources—a large parcel of publicly owned vacant land in New York City and a $50 million allocation of public funds. In that

continuation of the process, respect for and adherence to the environmental process and goals and ULURP procedures will cause some delay but following that steady path will lead to a balanced and worthy result.

There are two further procedural points. There is no opposition presented to the request of the Real Estate Board of New York, Inc., that the complaint be dismissed as against it and that it be stricken from the caption.

Although the city notes that the Community Board is not a proper party petitioner, citing *Matter of Community Bd. No. 4 (Manhattan) v Board of Estimate* (88 AD2d 832, *affd on opn below* 57 NY2d 846), it does not seek dismissal of the Board. Without such a request, the court will not *sua sponte* strike the Board from caption.

Accordingly, the petition is granted to the extent indicated herein and otherwise denied.