Coalition for Responsible Planning, Inc., et al., Respondents-Appellants, v Edward I. Koch, as Mayor of the City of New York, et al., Appellants-Respondents.

First Department, June 27, 1989

APPEARANCES OF COUNSEL

*Fay Leoussis* of counsel *(Leonard Koerner, Jeffrey Schanback* and *Vincent Torna* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for municipal appellants-respondents.

*William O. Purcell* of counsel *(Ellen R. Zimmerman* and *Brad D. Rose* with him on the brief; *Lord Day & Lord, Barrett Smith,* attorneys), for Real Estate Board Housing Development and the Real Estate Board of New York, appellants-respondents.

*Richard F. Braun* for respondents-appellants.

*James R. Sandner (R. Lynette Copeland* and *Paul H. Janis* on the brief), for United Federation of Teachers Local 2, AFL-CIO, *amicus curiae.*

*Richard Rivera* of counsel to Puerto Rican Legal Defense and Education Fund, Inc.; *Andrew Scherer* of counsel to Community Action for Legal Services; *Hillary Exter* and *Brian Glick* of counsel to Brooklyn Legal Services, Corp. A; *Stephanie Moore* of counsel to Center for Constitutional Rights; and *Wendy Brown* of counsel to Center for Law—Social Justice of Medgar Evers College, CUNY, all appearing on behalf of Housing Justice Campaign, *amicus curiae.*

### OPINION OF THE COURT

KUPFERMAN, J. P.

As part of a joint effort by the public and private sectors to provide 10,000 affordable housing units per year for moderate to middle income families earning between $25,000 and $48,000 a year, the proposed Tibbett Gardens residential complex is to be built by the Real Estate Board Housing Development Fund Corporation, a group of project developers who agreed to build the first 3,000 units at no profit, on a 10.22-acre

predominantly vacant site in the northwest Bronx, bounded on the south by John F. Kennedy High School and on the north by West 230th Street. As originally proposed, the entire site would be developed with a 1,001-unit residential development in buildings ranging from 4 to 15 stories. The site would also contain a 629-space, five-story parking garage, 72 additional parking spaces, three acres of open space, including 2 or 3 children's playgrounds, approximately 10,000 square feet of community facility space and approximately 16,000 square feet of neighborhood retail space.

Pursuant to ECL article 8, known as the State Environmental Quality Review Act (SEQRA), and the City Environmental Quality Review mandated by Executive Order No. 91 (Aug. 24, 1977) (CEQR), an environmental impact statement is required for any proposed project which may have a significant effect on the environment. Where an environmental impact statement is required, a draft environmental impact statement (DEIS) must first be prepared by either the applicant or the governmental agency to which public comment is invited at a public hearing. This procedure may be consolidated with the Uniform Land Use Review Procedures (ULURP) mandated by New York City Charter § 197-c.

After the required review by the Departments of City Planning and Environmental Protection, the DEIS, which contained a so-called "no-build" alternative and an educational park alternative, was distributed for public comment and a public hearing was held jointly with the ULURP hearing before Community Board 8 on June 30, 1987 and before the City Planning Commission on August 5, and September 2, 1987. After its hearing, Community Board 8, on July 28, 1987, adopted a resolution disapproving the project.

In response to the oral and written comments received from 125 individuals and groups, including petitioners, the City Planning and Environmental Protection Departments prepared a Final Environmental Impact Statement (FEIS) embodying two additional alternatives, which proposed downscaling the project to 500 or 750 dwelling units, respectively, and building a 750-seat elementary school, a 40,000-square-foot community facility building with day-care facilities and community rooms, a three-story, 300-space parking garage and approximately 5,500 square feet of retail space.

A detailed comparison of the environmental impacts of all four alternatives with the impact of the project as originally

proposed was included in the FEIS. The FEIS was then reviewed by the City Planning Commission, which, in a lengthy resolution, determined that the project as originally proposed warranted approval and forwarded its recommendation to the Board of Estimate.

Thereafter, at the public hearing held by the Board on November 19, 1987, the Commissioner of Housing Preservation and Development indicated that the Fund, in response to concerns expressed during the review process, agreed to attempt to sell 100 units to senior citizens and to build a 600-seat elementary school on the site, which school would undergo separate ULURP and environmental review.

By a vote of 9 to 2, the Board of Estimate adopted resolutions modifying the project to the extent of reducing the number of units to be built to 750 units, retaining an easement to permit fire department access to John F. Kennedy High School and limiting city funding assistance to $18,750,000 and sales of units to families with a maximum income of 180% of the median income for the New York City metropolitan statistical area.

This CPLR article 78 proceeding ensued in which petitioners assert that a supplemental environmental impact statement (SEIS) is required in light of the Board of Estimate's modification of the proposed project. The IAS court, in the judgment appealed from, annulled the Board of Estimate's resolutions and enjoined respondents from commencing construction of the project, concluding, *inter alia,* on the basis of city procedures and the record, that the required "hard look" at the need for an SEIS had not been undertaken and, since the environmental review process had not been followed, a remand was necessary in order to permit that administrative assessment (142 Misc 2d 1038).

As the IAS Justice recognized, the role of the courts is not to weigh the desirability of any action or to choose among alternatives, but to review the agency procedures, to determine whether they were lawful, and the record, to determine whether the agency identified the relevant areas of environmental concern, took a "hard look" at them and made a "reasoned elaboration" of the basis for its determination. *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 416-417, quoting from *Aldrich v Pattison,* 107 AD2d 258, 265; *see also, H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232.)

Pursuant to the statutory scheme, an agency making a final decision upon a project must make findings that the environmental concerns of SEQRA and CEQR and their regulations have been considered and satisfied. Although, at the time of its decision, there was no mention of an SEIS in the applicable statutes or regulations, the Court of Appeals inferred that an agency must prepare an SEIS if environmentally significant modifications are made *after* issuance of an FEIS. *(Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 429-430.) The subsequent revisions to 6 NYCRR part 617, dated February 18, 1987, provide that the lead agency *may* require an SEIS where "(i) changes are proposed for the project which may result in a significant adverse environmental effect; (ii) newly discovered information arises about significant adverse effects which was not previously addressed; or (iii) a change in circumstances arises which may result in a significant adverse environmental effect." (6 NYCRR 617.8 [g] [1]).

"Whether or not a modification is significant is generally a decision to be made by the agency after taking a 'hard look' *(see, Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1036-1037 * * *)." *(Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 430.)

"The purpose of an environmental impact statement is to provide detailed information about the effect which a proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or approve such action." (ECL 8-0109 [2]; *see, Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 220.)

A key element in the environmental review process is the public review and comments on the DEIS. Based in part on those comments, an FEIS is prepared which serves to inform the decision makers fully of the environmental impacts of the proposed action.

One of the major purposes of any FEIS is to suggest and discuss alternatives to the proposed action so as to aid the public and governmental bodies in assessing the relative costs and benefits of the proposal *(see, Webster Assocs. v Town of Webster,* 59 NY2d 220, 228; Weinberg, Practice Commentary, McKinney's Cons Laws of NY, Book 17½, ECL C8-0109:5, at

78). SEQRA does not require that every conceivable alternative must be considered before an FEIS will be considered acceptable and the degree of detail with which each alternative must be discussed will, of course, vary with the circumstances and nature of each proposal. *(Webster Assocs. v Town of Webster, supra,* at 228; *Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805.)

An FEIS is not merely intended to serve as a disclosure statement of the environmental impact of a project, but, more importantly, is intended to serve as an aid in an agency's evaluation and balancing of the competing factors and in choosing those alternatives which, consistent with the goals of the project, minimize adverse environmental effects to the maximum extent practicable *(Matter of Jackson v New York State Urban Dev. Corp.,* 110 AD2d 304, 307, *affd* 67 NY2d 400, *supra; see,* ECL 8-0109 [4]).

As noted above, the DEIS proposed two alternatives to the original proposal for a 1,001-unit residential complex: a no-build alternative and an educational park alternative providing, *inter alia,* for two middle schools totaling 3,000 seats and one 600-seat elementary school.

At the public hearing held on the DEIS, there was virtually unanimous opposition to the project from elected officials, clergy, community organizations and representatives of other communities revolving around increased traffic, overcrowded schools and population density. It was in response to a specific proposal made at the public hearings on the DEIS that the first of the two additional alternatives, a mixture of the original proposal and the educational park alternative, was included and considered in the FEIS. This alternative would have necessitated rezoning the site to an R5 zoning district. The second additional alternative, essentially the one adopted by the Board of Estimate, was included and considered as a variation of the first mixed use alternative which would retain the site's underlying R6 zoning.

Applying the appropriate standard of judicial review, it is clear that the requirements of SEQRA and CEQR were fully met by the respondents. This is not a situation where the inclusion of the alternative proposal in the FEIS was intended to cure its omission in the DEIS *(see, e.g., Webster Assocs. v Town of Webster, supra,* 59 NY2d, at 228). Since the elementary school portion of the alternative adopted still has to undergo ULURP and environmental review, the 750-unit resi-

dential complex approved by the Board is merely a smaller version of the original proposal and the environmental impact considerations are virtually identical to those raised during the public review of the DEIS. Petitioners do not claim that a "hard look" was not taken at the 1,001-unit residential complex originally proposed or the no-build and educational park alternatives in the DEIS and there is no claim, nor could there be, that the Board of Estimate was limited to approving or disapproving the project as originally proposed. The Board has the final authority respecting the use, development and improvement of city land and it could have adopted one of the original alternatives, viz., the no-build or the educational park, as well as either of the two additional alternatives, which were the product of the environmental review process itself. (NY City Charter § 67; *Starburst Realty Corp. v City of New York,* 125 AD2d 148, 156-157, *lv denied* 70 NY2d 605.) Indeed, what better example of the requisite "hard look" is there than the incorporation in the FEIS and adoption by the Board of Estimate of alternatives developed as a direct result of the review process? In fact, the review procedure actually resulted in a smaller number of residential units. *(See, Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 492, *affd* 60 NY2d 805, *supra).*

Finally, although prior to January 6, 1987, when the Department of General Services formally accepted surrender of the Tibbett Gardens site from the Board of Education, there was no ULURP review as mandated by New York City Charter § 197-c (10) (a) (added by Board of Estimate Resolution No. 44 adopted Dec. 4, 1986), there has already been a thorough ULURP review of the site's development as a residential complex and it would only mean a further, unnecessary delay to remand the matter for a separate ULURP review of the original interdepartmental transfer, particularly where the proposed construction of an elementary school as part of the over-all project will undergo separate ULURP and environmental review.

Accordingly, the judgment of the Supreme Court, New York County (Diane S. Lebedeff, J.), entered December 20, 1988, which granted the petition to the extent, *inter alia,* of annulling resolutions Nos. 28, 29 and 32 adopted by the Board of Estimate on November 19, 1987 and enjoining respondents from commencing construction of the proposed Tibbett Gardens housing project until the municipal respondents conduct a supplemental environmental impact statement assessment

and the Board of Estimate approves any interagency transfer or transfer to the Real Estate Board Housing Development Fund of the Tibbett Gardens site, should be modified, on the law, to reverse and vacate the foregoing determinations and to deny the amended petition and dismiss the proceeding accordingly, and, as so modified the judgment should otherwise be affirmed, without costs.

KASSAL, ROSENBERGER and WALLACH, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 20, 1988, unanimously modified, on the law, to reverse and vacate the determinations and to deny the amended petition and dismiss the proceeding accordingly, and, as so modified, the judgment otherwise affirmed, without costs and without disbursements.