HOUSING JUSTICE CAMPAIGN et al., Respondents-Appellants, v EDWARD I. KOCH, as Mayor of the City of New York, et al., Appellants-Respondents.

First Department, January 24, 1991

## APPEARANCES OF COUNSEL

*Fay Leoussis* of counsel *(Leonard Koerner* with her on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for appellants-respondents.

*Arthur A. Baer* of counsel *(Ruben Franco, Richard Rivera, Andrew Scherer, David Robinson, Hillary Exter, Brian Glick, Stephanie Moore, Roger Wareham* and *Dianne Dixon* with him on the brief; *Puerto Rican Legal Defense and Education Fund, Inc., Legal Services for New York, Brooklyn Legal Services Corp. A, Center for Constitutional Rights* and *Center for Law*

*and Social Justice of Medgar Evers College, CUNY,* attorney), for respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J.

At issue is a challenge, based on alleged violations of various charter and other statutory provisions, State and city environmental laws and fair housing laws, to former Mayor Koch's 1988 "10-year plan", a projected allocation of $5.1 billion over the next 10 fiscal years to "produce, preserve, and upgrade 252,000 vacant and occupied" housing units "for low, moderate, and middle-income New Yorkers". Plaintiffs argue that the available funds should, instead, be allocated and city-owned buildings made available first to the city's poor or, at a minimum, in proportion to the percentages of the city's various income groups to its over-all population.

By April 26th of every year, the Mayor must, after having submitted in January of the particular year his preliminary capital budget proposals to the Board of Estimate, City Council, City Planning Commission, Department of City Planning, Borough Boards and each Community Planning Board, as is required (1975 NY City Charter § 214-a [a]; 1989 NY City Charter § 235),[1] submit a proposed executive capital budget for the next fiscal year and "a proposed executive capital program for the three succeeding fiscal years" to the Board of Estimate and City Council. (1975 NY City Charter § 219; 1989 NY City Charter § 225 [a]; § 249.)

The executive capital budget is a detailed document containing, *inter alia,* a brief description and the location and total estimated cost of each project in the five boroughs, the sources of funding for the particular project and the amount of obligations to undertake and complete it. (1975 NY City Charter § 219 [c]; 1989 NY City Charter § 214 [a].) The three-year proposed executive capital program is, on the other hand, merely a statement of "total dollar authorizations and supporting schedules indicating the amount of funds obligated for each project" and the amounts necessary to complete projects already initiated as well as those proposed to be initiated in future budgets. (1975 NY City Charter § 219 [c] [1]; 1989 NY City Charter § 214 [b].)

---

1. Since this action involves budget documents prepared in 1986 and 1988, before the revision of the Charter, effective January 1990, references are to the then-applicable budget procedures as well as the new Charter provisions.

Under the 1975 Charter, each Community Board, between January and March 15th, was required to hold a public hearing on the Mayor's preliminary proposals and each Community Planning Board, Borough Board and the City Planning Commission were required to submit their assessment of capital needs to the Mayor, Board of Estimate and City Council. (1975 NY City Charter § 214-a [a], [b], [c], [d].) The 1989 Charter provides for similar extensive budget review, both before and after the executive budget is proposed, by community boards, various agencies and the public. (1989 NY City Charter chs 9, 10.)

The Board of Estimate and City Council were required to hold a joint public hearing on the Mayor's preliminary budget proposals on or before March 25th (1975 NY City Charter § 216) and to hold public hearings on the proposed executive capital budget between May 6 and May 25. (1975 NY City Charter § 221.) Both had authority to "increase, decrease or omit the amount of the appropriation for any capital project * * * or add any new capital project". (1975 NY City Charter § 222 [a].) The Mayor was not permitted to participate in any Board of Estimate vote on an executive budget. (1975 NY City Charter § 222 [c].) Hence, no expenditure proposed by the Mayor in either his executive budget or three-year capital program was final. The 1989 Charter similarly permits modification by the City Council and requires its final approval. (See, e.g., § 254.)

In early 1982, in addition to the mandated annual executive capital budget and proposed three-year capital program, former Mayor Koch voluntarily issued a plan, known as the "10-Year Capital Plan", which was similar to the three-year "capital program" specified in the Charter (1975 NY City Charter § 219 [a]; 1989 NY City Charter § 214 [b] [1]) and included the anticipated spending of all agencies using a substantial portion of the city's capital funds for the next 10 years. Since he found it useful in forecasting the city's ability to raise the necessary capital funding through the bond market and to lay out the broad priorities for spending those funds, the former Mayor decided to issue voluntarily a 10-Year Capital Plan every two years. It was, however, only through the annual capital and expense budgets, which were and continue to be subject to the extensive public-hearing and revision process previously described, that any of the proposed funding in the 10-Year Capital Plan, including that earmarked for housing, could be allocated. The Mayor, then as

now, does not have the power, without prior review and action by the Board of Estimate or City Council, to implement any of his budget proposals. Thus, while the 10-Year Capital Plan and housing budget included ·therein reflected the former Mayor's plans as to the level of funding to be committed to the various city agencies over the next 10 years, the allocation of the funds was a decision to be made annually by the Mayor, Board of Estimate and City Council (see, 1975 NY City Charter § 222), as it is now under the 1989 Charter (see, §§ 225, 254).

Included in the Mayor's 1986 10-Year Capital Plan for fiscal years 1987-1996 was an unprecedented proposed housing allocation of $4.2 billion to the Department of Housing Preservation and Development (HPD), labeled in an April 30, 1986 special press release as the "10-year plan" or the "10-year program". The plan provided for an allocation of $2.7 billion, about 64% of the funds, for the reconstruction, preservation and rehabilitation of 126,000 units for low-income households (defined then as families with incomes up to $15,000); $900 million, approximately 21%, for the creation of new units and upgrading of 76,000 private units for moderate-income households (annual family income of $15,000-$25,000); it also targeted $600 million, approximately 14%, to providing government support for the private development of 33,000 new units for middle-income households (annual family income of $25,000-$48,000). Thus, the plan called for the creation of 66,000 new units and the preservation and rehabilitation of 186,000 more. It did not, however, as is conceded, contain any specific programs or identify the sites, neighborhoods or buildings that would be directly affected.

In his 1988 10-Year Capital Plan for fiscal years 1989 to 1998, Mayor Koch not only adhered to the 1986 plan's proposed housing commitment but, in fact, increased the proposed fiscal commitment to $5.1 billion, $4.1 billion of which was to be city-funded. The 1988 plan's proposed allocation of 63% of the funds for creating, preserving and rehabilitating units for low-income families, which, based on the 1988 median-income statistics compiled by the United States Department of Housing and Urban Development (HUD), were now listed as households earning less than or equal to $19,000, or 60% of the 1988 area median-income, compared favorably with the 1986 capital housing program's 64% allocation. 23% of the funds were allocated to moderate-income households, listed as those with family incomes of $19,000 to $32,000, and

14% to middle-income households, defined as those with family incomes of $32,000 to $53,000.

Of the 252,000 units to be affected by the 1988 plan, 84,000 would be newly created, 47,000 by renovation of city-owned buildings taken, in rem, in tax foreclosures, of which 15,000 are targeted for the homeless and the balance for low- and moderate-income families. The other 37,000 newly constructed units would be privately developed with city subsidies and made affordable to moderate- and middle-income families. Approximately 168,000 of the 252,000 units, located in both city and privately owned buildings and occupied exclusively by low- and moderate-income families, would be preserved without major rehabilitation.

Like its 1986 counterpart, the 1988 10-year capital housing proposal does not specify sites for any particular projects or target specific neighborhoods or buildings for improvement. A part of the 10-Year Capital Plan, the 1988 housing plan contains only the proposed amount of funding for housing, the sources of such funding, the proposed allocations among the different income groups—homeless, low, moderate and middle for which the private sector is no longer producing affordable housing—and the proposed number of units to be created, upgraded or renovated. The 1986 and 1988 housing plans contemplate both rental and home-ownership opportunities. Thus, in taking into account the unique housing needs of each of the different income groups and the resultant benefit to the city in providing such housing, the 1986 and 1988 10-year housing plans were designed to provide capital funds for a variety of pressing housing needs. The 1989 Charter Revision Commission found the biennial proposed 10-Year Capital Plan and 10-year capital housing plan therein to be so useful as to incorporate it into the new Charter's budget process. (See, 1989 NY City Charter §§ 215, 228, 234, 248, 257.)

In January 1988, almost two years after the announcement of the proposed 1986 10-year capital housing plan and inception of many of the programs to which the plan's funds were allocated in the subsequent annual executive capital budget, plaintiffs, Housing Justice Campaign, a coalition of several hundred community, housing and tenant groups, labor unions, religious institutions and civic and homeless groups, and six homeless individuals living in welfare hotels and shelters, commenced this action, alleging that the plan is, in fact, a subsidized middle-income and market-rate housing plan, which disproportionately excludes poor and moderate-income

families as well as members of racial and ethnic minorities. Plaintiffs sought to prohibit defendants, the former Mayor and Commissioner of HPD, from further implementing the 10-year plan until they develop a comprehensive plan that considers and provides permanent, affordable housing for households that present the most pressing housing needs in New York City, i.e., the homeless, those at risk of homelessness, and low- and moderate-income households.

Plaintiffs sought both declaratory and injunctive relief and asserted five causes of action. In the first, they alleged that the 10-year plan had to be submitted, pursuant to section 197-a of the New York City Charter, to all 59 community boards and the five borough boards for review and ultimately to the Board of Estimate for approval. The second cause of action alleged a violation of State and city environmental review requirements. The third cause of action alleged violations of Federal and State laws prohibiting racial and ethnic discrimination in housing. The fourth cause of action, which alleged that defendants' approval of one of the projects (Tibbett Gardens) for moderate- to middle-income households proposed to be built by the Real Estate Board Housing Development Fund Company (HDFC) violates article XI of the Private Housing Finance Law, was dismissed by the IAS court and is not an issue on appeal. The fifth cause of action alleged that the proposed allocation of housing funds over the next 10 years violates the New York State Constitution, various statutes, and the New York City Charter, which, plaintiffs allege, require defendants "to use [their] land use power in a manner that serves the general welfare."

Defendants moved to dismiss the complaint on Statute of Limitations grounds and for failure to state a cause of action, asserting that the 10-year capital housing plan is only a desired budget projection, which is neither final nor certain of allocation; that the plan is merely a fiscal document containing "proposed funding commitments for the next decade" and thus is neither a "plan" for city planning purposes within the meaning of section 197-a of the Charter[2] nor an "action" within the purview of the environmental laws. As for plaintiffs' discrimination claims, defendants argued that the Federal and State fair housing laws have been held not to impose

---

2. Although the new Charter contains amendments to section 197-a, the section has not been materially changed. Insofar as is relevant to the instant matter, the language in former section 197-a remains unchanged.

a duty to provide or promote any particular type of housing and that plaintiffs must show that members of minority groups will be barred from the newly created units because of their race or ethnic origin, not their economic status. Finally, defendants argued, plaintiffs are not entitled to mandamus directing defendants to devise a comprehensive plan to provide permanent, affordable housing for "the homeless and other low and moderate-income persons at risk of being displaced and becoming homeless" since such directive would encroach on separation of powers principles.

During the pendency of the motion and before plaintiffs' responsive papers were due, Mayor Koch announced his 1988 proposed 10-Year Capital Plan containing the revised 10-year housing plan. In their response, plaintiffs, *inter alia,* focused on their disagreement with the proposed allocations and pointed to the concrete results of defendants' implementation of the 10-year plan to illustrate that, for City Charter purposes, it is a "plan".

Plaintiffs also, during the pendency of the dismissal motion, moved for an order preliminarily enjoining defendants from allocating any funds for housing without first conducting the reviews set forth in section 197-a of the Charter and the environmental laws; awarding any new sites pursuant to the financing provisions of HPD's Vacant Buildings Program; proceeding with any housing projects funded with capital moneys proposed by the 10-year housing plan that failed "to allocate to low-income households a proportion of newly-produced housing units equal to or greater than the proportion of such households in the population of New York City"; and proceeding with HDFC's Tibbett Gardens development. In support of their irreparable harm argument, the individual plaintiffs claimed that they were injured by the consequences of prolonged homelessness. All plaintiffs claimed that without an injunction against all housing spending, the city's in rem building stock and limited financial resources would be exhausted.

The IAS court, characterizing all but one of plaintiffs' five claims as seeking a declaratory judgment, denied the motion to dismiss. The court considered plaintiffs' City Charter claim as seeking mandamus relief to compel defendants to perform the mandatory duty imposed by section 197-a. In a subsequent order, the court, finding itself constrained by *Coalition for Responsible Planning v Koch* (148 AD2d 230, *lv denied* 75 NY2d 704), denied injunctive relief on plaintiffs' claim that

DHFC's Tibbett Gardens development violated the Private Housing Finance Law and dismissed that claim. Finding "many disputed facts", it also denied injunctive relief on plaintiffs' environmental, fair housing and constitutional claims. With respect to plaintiffs' section 197-a claim, the court found that since the 1988 10-year capital housing plan "proposes the use of specified and known City-owned vacant land and buildings already taken by the City in tax foreclosure *in rem* proceedings", it was a plan for city planning purposes within the meaning of section 197-a as it "promotes the growth, development and improvement of the City". As a consequence, the court found, when Mayor Koch issued his 10-year fiscal housing proposals in 1986 and 1988, he "initiated" plans under section 197-a, which were subject to that section's review procedures. Ordering defendants to use "reasonable expedition" in conducting the review, the court directed that the section 197-a review process be initiated "within (30) days after service of a copy of [the] order with notice of entry." The court, however, refused to enjoin the construction, renovation or preservation of housing under the various city programs pending such review. Plaintiffs' motion and defendants' cross motion to reargue were denied.

▋ Defendants appeal from the denial of their dismissal motion and that part of the subsequent order which enjoined them to follow section 197-a's public review procedures with respect to the 10-year plan, "as it exists at the time of [the] order and as it has already been implemented." Plaintiffs cross appeal to enjoin, pending completion of the section 197-a review process, further implementation of those projects in the preconstruction development stage and the allocation of units in completed but unoccupied projects and projects presently under construction. Both appeals have been consolidated. For the reasons that follow, we find that the complaint should be dismissed, a declaration made in defendants' favor with respect to each cause of action and the preliminary injunction issued in connection with the section 197-a claim vacated.

The 10-year capital housing plan contained in the 10-Year Capital Plan is a budget document and not a "plan" for city planning purposes within the meaning of section 197-a of the Charter. Prepared by the Office of Management and Budget (OMB) and containing broad proposals with respect to suggested funding allocations over the next 10 years, the plan does not contain any mention, much less comprehensive anal-

ysis, of any specific parcels of property, neighborhoods or areas to be affected. The former Mayor's press releases announcing the proposed 10-year capital housing budget and HPD's announcement of how it hopes to allocate the proposed funding similarly do not contain any detailed proposals as to any specific neighborhood or, for that matter, any identifiable geographic area.

Notably, when executive budget proposals, either similar or identical to the proposed 10-Year Capital Plan, were discussed before the 1975 and 1989 Charter Revision Commissions, it was within the context of the budget provisions of the Charter. Before 1975, the City Planning Commission was empowered to prepare the capital budget and also mandated to propose a five-year capital budget plan similar to the 10-year plan at issue here. (See, 1972 NY City Charter § 217.) In determining to relieve the City Planning Commission of its responsibility to propose the capital budget and imposing the requirement of a proposed three-year capital plan, to be prepared by the Mayor, the 1975 Charter Revision Commission noted, "Individual members of the Planning Commission do not have the time to acquire expertise on more than a handful of specific capital budget proposals and depend almost completely on the Planning Department. * * * The charter mandates a five-year capital improvement plan (section 217). * * * Despite shortcomings in the existing capital improvement plan, the Charter Commission believes it is essential for the City to engage in realistic future capital planning and to know the financial implications of individual capital projects during the years after their inception. * * * A realistic three-year capital program, adopted annually by the Board of Estimate and the City Council, would be useful in instilling a measure of discipline into the capital budget process." (Preliminary Recommendations of 1975 Charter Rev Commn for NY City, at 21, 23 [1975 Preliminary Recommendations].) Thus, the framers of the 1975 Charter clearly recognized the proposed three-year capital plan as a budget device, placing it in the "Capital Projects and Budget" chapter (see, 1975 NY City Charter § 219 [a]), and not as a plan for city planning purposes under section 197-a, which is located in the Charter's "City Planning" chapter.

The 1989 Charter Revision Commission similarly referred to the 10-Year Capital Plan as a budget document and, finding it to be so useful, made it a requirement in the 1989 Charter amendments (see, 1989 NY City Charter §§ 215, 228, 234, 248,

257); it appears in chapters 9 and 10, entitled "Capital Projects and Budget" and "Budget Process", respectively. While providing express submission, review and approval procedures, the 1989 Commission, like its 1975 counterpart, declined to require submission of the 10-Year Capital Plan to section 197-a's review procedures. Instead, in preparing the "ten-year capital strategy", as the plan is now designated in the newly amended Charter, OMB and the Department of City Planning are required, pursuant to section 215 (c) (ii), to consider, *inter alia*, "relevant citywide, borough and community plans adopted pursuant to section one hundred ninety seven-a". In so providing, the 1989 Charter Revision Commission, while recognizing the relationship between budget proposals and plans for city planning purposes, clearly viewed the 10-Year Capital Plan's budget proposals and section 197-a plans as separate and distinct documents.

Furthermore, in requiring the drafters of the 10-year capital strategy to review any section 197-a plans, without providing for a reciprocally required section 197-a review of any 10-year capital budget proposals, and in placing the mandate to create a biennial 10-year strategy in the Charter's capital budget chapters, the 1989 Charter Revision Commission obviously believed the 10-Year Capital Plan to be a budget document, not a city planning document within the ambit of section 197-a. Thus, it seems clear, neither the 1975 nor 1989 Charter Revision Commissions contemplated long-term capital budget plans as being within the scope of section 197-a.

The 1975 Charter Revision Commission, in its Preliminary Recommendations, placed its discussion of section 197-a, which replaced old section 197, requiring the City Planning Commission to prepare a Master Plan of the City, in a section entitled "Planning for Land Use" and included it in the Charter's city planning chapter. *(See,* 1975 NY City Charter § 191 *et seq;* 1975 Preliminary Recommendations, at 113, 123.) The 1975 Commission, believing that the Master Plan, a massive undertaking that took into account the entire city's transportation routes and facilities, parks, public utilities, zoning districts and many other land use considerations, and outlived its usefulness since it was often obsolete by the time it was completed *(see,* 1975 Preliminary Recommendations, at 113, 123), substituted a continuous planning model, which permitted either the Mayor, the Planning Commission or any of the city's planning districts to propose or adopt, at any time, plans involving a particular district or neighborhood *(ibid.).* The

1975 Commission considered section 197-a plans to be comprehensive, albeit small-scale, land-use proposals. *(See, id.,* at 123.)

In recommending the reenactment of section 197-a, the 1989 Charter Revision Commission retained the continuous planning concept and viewed a section 197-a plan as tied to land use and not encompassing budget proposals. *(See,* Aug. 1, 1989 Panel Meeting of 1989 Charter Rev Commn, at 113, 114, 118, 120, 122 [Aug. 1, 1989 Panel Meeting].) City planning experts have similarly expressed the view that capital budget proposals, even though suggesting the allocation of resources to effectuate a land-use plan, do not themselves constitute plans for city planning. *(See,* Goodman & Freund, Principles and Practice of Urban Planning, at 350 [1968]; Branch, Continuous City Planning, at 37, reprinted in The Comprehensive Planning Process: Several Views, Reading for American Institute of Planners Examination [2d ed 1975].)

As these experts make clear, a plan for purposes of city planning, whether a master plan or one of limited range, contains a comprehensive assessment of an area's current status, in terms of population, housing, land use, zoning, transportation, utilities, facilities, environment and employment, as well as recommendations for its future development. (Goodman & Freund, *op. cit.,* at 26; *Branch, supra,* at 37.) Since the 10-year capital housing plan is limited to advancing fiscal proposals for housing and stating as a goal the renovation of 47,000 of the city's in rem units in vacant buildings and the creation and rehabilitation of 205,000 other units, primarily in privately owned buildings, without any indication of the neighborhoods or other geographic areas to be affected, it is not a plan for city planning purposes.

Furthermore, since the 1975 and 1989 Charters clearly set forth the powers of the Board of Estimate, City Council, City Planning Commission and Mayor with respect to the latter's proposed annual budget and the mandated proposed three-year capital plan (1975 NY City Charter § 216 [a]; § 219 [c]; §§ 221, 222; 1989 NY City Charter §§ 213, 253, 254), incorporated into the 1988 10-year plan, it would be inappropriate to subject the former Mayor's 1989-1998 10-year housing plan to a second round of review under section 197-a's significantly different and lengthy and extensive procedures. Moreover, the 1989 Charter amendments mandate, as part of the budget process, the preparation of the biennial proposed 10-Year Capital Plan and set forth a comprehensive scheme, including

timetables, for the submission of drafts, the holding of public hearings and recommendations. (1989 NY City Charter §§ 215, 228, 234, 248, 257.) To require, in addition, compliance with section 197-a's procedures would be inconsistent with that statutory scheme.

■ Nor, since the former Mayor's 10-year capital housing plan is no more than a preliminary step in the process to create, renovate and rehabilitate 252,000 housing units for low-, moderate- and middle-income families, and does not commit HPD to any one specific project or development, is it an "action" subject to environmental review. Pursuant to the State Environmental Quality Review Act (SEQRA) "actions" triggering the statute's review procedures include:

"(i) projects or activities directly undertaken by any agency; or projects or activities supported in whole or part through contracts, grants, subsidies, loans, or other forms of funding assistance from one or more agencies; or projects or activities involving the issuance to a person of a lease, permit, license, certificate or other entitlement for use or permission to act by one or more agencies;

"(ii) policy, regulations, and procedure-making." (ECL 8-0105 [4].)

The State regulations elaborate on the definition of action (6 NYCRR 617.2 [b]) and specifically exclude from SEQRA's purview "preliminary planning and budgetary processes necessary to the formulation of a proposal for action, provided those activities do not commit the agency to commence, engage in or approve such action". (6 NYCRR 617.3 [c] [1].) The regulations further provide that "[a]ctions commonly consist of a set of activities or steps *(e.g.,* for capital projects the activities may include planning, design, contracting, demolition, construction and operation)." (6 NYCRR 617.3 [k].) Pursuant to ECL 8-0113 (3), which empowers local governments to adopt "such additional procedures as may be necessary * * * consistent with the rules and regulations adopted by the [State] commissioner", the city has adopted its own City Environmental Quality Review (CEQR) procedures.[3]

---

3.  In pertinent part, CEQR § 1 (a) provides:

*"Action* means any activity of an agency, other than an exempt action enumerated in section 4 of this Executive Order, including but not limited to the following:

"(1) non-ministerial decisions on physical activities such as construction or other activities which change the use or appearance of any natural resource or structure;

*(n. cont'd)*

As these statutes and regulations, facially and as construed, make clear, proposed allocations of funds to agencies, not earmarked for a specific development and not legislatively approved, like the 10-year capital housing plan, are excluded from environmental review. The former Mayor's proposal to allocate $5.1 billion to HPD over the next 10 years does not commit it to any specific project and is, in any event, subject to the city's fiscal well-being and legislative approval, as well as to the whims of an ever changing political climate. Since the plan is no more than an expression of the former Mayor's housing goals, the requisite environmental reviews will be conducted, as was the case with the proposed Tibbett Gardens development, for which some of the plan's proposed funding was earmarked *(see, Coalition for Responsible Planning v Koch,* 148 AD2d 230, *supra),* when the funds are actually committed to specific projects.

█ In support of their claim that environmental review is mandated, plaintiffs, citing *Chinese Staff & Workers Assn. v City of New York* (68 NY2d 359, 366-367), argue that SEQRA and CEQR require early consideration in the planning process as to whether the 10-year plan's proposals may cause the displacement of residents and businesses in the surrounding communities. While secondary displacement is an element of environmental review, it is not a factor in the budget process until funding is actually committed to a specific development. As the Court of Appeals has held in another, but similar, context: "While preliminary steps in the planning of the 42nd Street Development Project have been taken, an environmental impact statement is not required until a specific project plan for the development is actually formulated and proposed." *(Matter of Programming & Sys. v New York State*

"(2) non-ministerial decisions on funding activities such as the proposing, approval or disapproval of contracts, grants, subsidies, loans, tax abatements or exemptions or other forms of direct or indirect financial assistance, other than expense budget funding activities;

"(3) planning activities such as site selection for other activities and the proposing, approval or disapproval of master or long range plans, zoning or other land use maps, ordinances or regulations, development plans or other plans designed to provide a program for future activities;

"(4) policy making activities such as the making, modification or establishment of rules, regulations, procedures, policies and guidelines;

"(5) non-ministerial decisions on licensing activities, such as the proposing, approval or disapproval of a lease, permit, license, certificate or other entitlement for use or permission to act." (Executive Order No. 91, Aug. 24, 1977.)

*Urban Dev. Corp.,* 61 NY2d 738, 739; *see also, Cross Westchester Dev. Corp. v Town Bd.,* 141 AD2d 796.)

Plaintiffs further argue that, because some of the proposed moneys have actually been appropriated by the Board of Estimate and City Council to HPD, which, through its various programs, has, in turn, dispensed some of those funds to specific projects, the plan is an "action" within the meaning of the environmental laws. Any specific project subject to such review that has gotten beyond the preliminary planning stage has, in fact, been subjected to environmental review. That a governmental proposal will, at some future date, mature into an "action" does not render the proposal itself an action within the meaning of the environmental laws.

■ Plaintiffs also attack the proposed capital housing plan as violative of the Federal Fair Housing Act in that the income guidelines defining eligibility for the projects will have the inevitable effect of disproportionately excluding the city's black and Hispanic population. Since, however, about $2 billion of the proposed allocation of $5.1 billion is earmarked to preserve and upgrade 168,000 low- and moderate-income units in both the city's occupied in rem properties and privately owned occupied buildings, presumably, their complaint is limited to the more than $3 billion proposed for the creation of 84,000 new housing units, 47,000 of which are in the city's in rem buildings and are to be rehabilitated at a cost of $2.2 billion. Of the latter, 15,000 are designated for the homeless and the remaining 32,000 units are earmarked for low- and moderate-income families. In addition, private developers with about $800 million in city financial assistance will build 37,000 new moderate- and middle-income housing units. Since plaintiffs themselves assert that most of the homeless are members of a minority group, that portion of the plan designating 15,000 in rem units for the homeless cannot be racially discriminatory. The balance of the funds designated for the creation of new units are earmarked for low-, moderate- and middle-income families, an allocation which can hardly be considered discriminatory.

In asserting their discrimination claim, plaintiffs have not alleged that the city, in its site selection, is perpetuating segregation, that it has refused to approve specific proposals by private developers to build low- and moderate-income housing projects in white neighborhoods or that the city intends to establish racial quotas or otherwise use race as a factor in determining eligibility for occupancy in the new

units. Instead, they claim that the decision to encourage mixed-income housing, to use HUD's statistics to define low-, moderate- and middle-income and to allocate 14% of the proposed budget to the creation of middle-income units will exclude members of minorities in all newly created units since, according to 1980 census statistics, only 16% of black and 11% of Puerto Rican families can afford most of the units. Thus, plaintiffs are, in effect, arguing that the city should be providing more affordable housing for its low-income families, which they define as those having incomes of $15,000 a year or less, and the majority of which are members of a minority group. This failure, plaintiffs contend, has a discriminatory effect, which constitutes a violation of title VIII of the Fair Housing Act of 1968 (42 USC § 3601 *et seq.),* as subsequently amended.

A prima facie case in a title VIII claim is established "by showing that the challenged practice * * * 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.' " *(Huntington Branch, Natl. Assn. for Advancement of Colored People v Town of Huntington,* 844 F2d 926, 934, *affd* 488 US 15.) While a "plaintiff need not show that the decision complained of was made with discriminatory intent" *(supra,* at 934), his proof will fall short if he cannot show that segregation will result or be perpetuated by the challenged practice or that similarly situated nonminority group members will not be as adversely affected as minority group members. Courts have consistently held that allegations of wealth discrimination, which is really what plaintiffs are asserting, are outside the ambit of constitutional protection or any statute protecting constitutional rights, such as the Fair Housing Act. *(See, e.g., San Antonio School Dist. v Rodriguez,* 411 US 1, 18-29; *Jaimes v Toledo Metropolitan Hous. Auth.,* 758 F2d 1086, 1103.) Nor does the Fair Housing Act compel the construction of housing of any kind. *(United States v Yonkers Bd. of Educ.,* 837 F2d 1181, 1218, *cert denied* 486 US 1055.)

In any event, plaintiffs' claim, as pleaded, fails to state a cause of action under the Fair Housing Act because defendants are not involved "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" as plaintiffs, relying on 42 USC § 3604 (b), allege. Section 3604 (b) applies to services which are generally provided by governmental agencies such as police and fire protection and refuse removal. *(See, South-*

*end Neighborhood Improvement Assn. v County of St. Clair*, 743 F2d 1207, 1210.) Construing the allegations of the complaint most liberally in their favor, plaintiffs would, in order to state a claim under the Fair Housing Act, have to show that the city, by determining to allocate funding to create housing units out of their economic reach, has engaged in or is about to engage in discrimination by "mak[ing] unavailable" dwellings to persons because of their "race", "color", or "national origin" (42 USC § 3604 [a]). In our view, plaintiffs have failed to allege facts sufficient to make the requisite showing as to either element.

In asserting their claim, plaintiffs focus on only one aspect of the 10-Year Capital Plan, i.e., the renovation of 32,000 in rem units for low- and moderate-income families. Based on their view of how the city is implementing that one segment of the plan, they claim that "the clear and foreseeable effect of the plan is to produce housing unaffordable to the homeless * * * and to two-thirds of the city's low to moderate income renter population, over 80% of whom are Black, Latino and other racial minority residents". In addition to overlooking the plan's proposed allocation of billions of dollars for the creation and preservation of housing for the city's homeless and low- and moderate-income groups, plaintiffs ignore the uncontroverted statistics which show that in the mixed-income units already created under the Vacant Buildings Program 80% of the units were rented to blacks and Hispanics. With respect to the moderate- and middle-income units created by the New York City Partnership, 85% have been rented to members of a minority group—60% to blacks, 15% to Hispanics and 10% to Asians. Moreover, the facts alleged by plaintiffs are insufficient to establish a prima facie showing that the plan's proposal to allocate billions of dollars to creating 47,000 low- and moderate-income units and $800 million to assist in the building of 37,000 middle-income units was based on "race, color, religion, sex, family status, or national origin", the other element of a section 3604 (a) claim.

We reject plaintiffs' argument that their allegations rise to the level of those in *Huntington Branch, Natl. Assn. for Advancement of Colored People v Town of Huntington* (844 F2d 926, *supra),* where the court found that a case of discriminatory effect had been stated. There, unlike here, the plaintiffs, in support of their claim that the town was making housing unavailable on the basis of race, alleged that Huntington's zoning ordinance restricts multifamily housing to a

section where 52% of the residents are members of a minority; 70% of Huntington's black population are concentrated in only two neighborhoods of Huntington; 28% of Huntington's minority members have incomes below the poverty line; and Huntington disapproved an application for a zoning variance to build multifamily subsidized housing in an historically 98% white area. In contrast, plaintiffs here do not allege any facts showing that segregated areas will be perpetuated within New York City as a result of the former Mayor's budget proposal and concede that most of the in rem buildings are already unavoidably located in areas where members of minority groups live.

Plaintiffs' conclusory allegations that the proposed 10-Year Capital Plan "excludes low-income housing" and "will cause displacement of low-income households" are not supported by any facts and are contradicted by the proposed monetary allocations in the 10-Year capital housing plan itself, the uncontroverted allocation of 15,000 in rem units to the homeless, the proposed allocation of $2 billion to upgrade and preserve 168,000 city-owned and private low- and moderate-income units, and by the fact that the units being created or renovated are being sold or rented predominantly to members of minority groups.

Moreover, plaintiffs make only speculative predictions that blacks and Hispanics will not be able to afford to rent or buy the newly created low-, moderate- and middle-income units. Since, as already noted, the undisputed statistics demonstrate the opposite, plaintiffs are left to argue that, based on 1980 census statistics, the income levels of 84% of blacks and 89% of Hispanics will foreclose those income groups from taking advantage of the units being created. Those statistics, however, do not "predictably" result in racial discrimination in housing. "[M]erely demonstrating a statistical imbalance, without more, does not establish a greater discriminatory adverse effect on one race compared to another." *(Edwards v Johnston County Health Dept.,* 885 F2d 1215, 1223.) The "more" required is a showing that similarly situated members of nonminority groups will not be as adversely affected as members of minority groups or that segregation will be perpetuated. *(See, Huntington Branch, Natl. Assn. for Advancement of Colored People v Town of Huntington, supra,* 884 F2d, at 932-933.) Plaintiffs have completely failed to make such a showing. They do not allege that similarly situated low- and moderate-income white families have been or will be favored

over blacks and Hispanics or that blacks and Hispanics who can afford the units will be excluded because of their race or national origin.

In asserting a general welfare claim under the State Constitution and various statutes in their fifth cause of action, plaintiffs argue that defendants have an obligation to use their power to designate the use of publicly owned real property in a manner that serves the general welfare and provides for those most in need. As a comprehensive plan for the disposition of vast amounts of such property, they claim, the 10-year plan is a major land-use decision, "very much like a zoning scheme". They argue further that as a zoning plan it does not promote the "general welfare" because it does not provide for the creation of permanent housing for the city's homeless and low-income families or at least in the proportion to the percentages that these groups bear to the city's over-all population.

■ While the funding of various projects may affect land use, and the proposed renovation of the city's in rem buildings affects land, such circumstances do not serve to convert a proposed executive allocation of funding for housing for the next 10 years, which is subject to change annually, into a legislative enactment determining land use. In any event, the plaintiffs in *Asia Ams. for Equality v Koch* (128 AD2d 99, 100-101, *affd* 72 NY2d 121, 134-135) made an almost identical claim, which was rejected both by this court and, under a different guise, by the Court of Appeals. The plaintiffs there argued that the amendment to the Zoning Resolution to create the Special Manhattan Bridge District in Chinatown violated the city's constitutional obligation to zone for the "general welfare" because the city did not affirmatively order low- and moderate-income housing for the newly created District. In rejecting the claim, the Court of Appeals reconfirmed the legal principle that "[w]hen enacting [zoning laws], City officials must address the needs of the broader community and must act not only for [the] benefit of the District and its residents, but for the benefit of the City as a whole." *(Supra,* at 134.)

Just as the city has no State constitutional obligation to zone low-income housing as part of a supposed obligation to serve the "general welfare", it has no obligation to allocate funding to build or finance low-income housing. In any event, as noted, the city has earmarked $2.2 billion for the creation of 47,000 low- and moderate-income units. It has also proposed

$800 million to help finance the private construction of 37,000 moderate- and middle-income units, which are needed if the city is to maintain its tax base and provide housing for middle-level management personnel who cannot afford private-sector housing. Thus, there is a benefit to "the City as a whole" in the proposal to allocate 14% of the proposed 10-year capital housing budget to help finance middle-income housing. Since plaintiffs "aid to the needy claim" is no different from its "general welfare" claim, it should be similarly rejected.

Accordingly, the order of the Supreme Court, New York County (Leonard Cohen, J.), entered May 3, 1989, denying defendants' motion to dismiss the complaint, should be reversed, on the law, without costs or disbursements, the motion granted and a declaration made that plaintiffs have failed to state claims on which relief can be afforded. The order of the same court and Justice, entered April 26, 1990, granting plaintiffs' motion for a preliminary injunction to the extent of enjoining defendants to follow the public review procedures of section 197-a of the City Charter with respect to the "Ten Year Plan, as it exists at the time of [the] order and as it has already been implemented", should be reversed, on the law, without costs or disbursements, and the motion denied in its entirety.

Murphy, P. J., Wallach and Smith, JJ., concur

Order, Supreme Court, New York County, entered on May 3, 1989, unanimously reversed, on the law, without costs or disbursements, the motion by defendants-appellants-respondents to dismiss the complaint is granted and a declaration made that plaintiffs have failed to state claims on which relief can be afforded. The order of the same court and Justice, entered April 26, 1990, granting plaintiffs' motion for a preliminary injunction to the extent indicated, is unanimously reversed, on the law, without costs or disbursements, and the motion denied in its entirety.